**Slip Op. 03-34**

# United States Court of International Trade

|  |  |
|---|---|
| USEC INC. and UNITED STATES ENRICHMENT CORPORATION,<br><br>               Plaintiffs,<br><br>        v.<br><br>UNITED STATES,<br><br>               Defendant. | Before:    Pogue, Wallach, and<br>               Eaton, Judges<br><br>Court No. 02-00112; and Court Nos. 02-00113, 02-00114 and Consol. Court Nos. 02-00219; 02-00221, 02-00227, 02-00229, and 02-00233<br><br>**Public Version** |

{Department of Commerce's final determinations vacated as unsupported by substantial evidence on the record and not in accordance with law, and remanded to Commerce for reconsideration.}

Decided: March 25, 2003

<u>Fried, Frank, Harris, Shriver & Jacobson</u> (<u>David E. Birenbaum</u>, <u>Jay R. Kraemer</u>, <u>Mark Fajfar</u>); <u>Weil, Gotshal & Manges LLP</u> (<u>Stuart M. Rosen</u>, <u>Gregory Husisian</u>, <u>Jennifer J. Rhodes</u>) for Plaintiffs and Defendant-Intervenors Eurodif S.A., COGEMA and COGEMA, Inc., Urenco Limited, Urenco Deutschland GmbH, Urenco Nederland B.V., Urenco (Capenhurst) Ltd., and Urenco, Inc.

<u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Lucius B. Lau</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, <u>David R. Mason</u>, Senior Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant United States.

<u>Steptoe & Johnson, LLP</u> (<u>Sheldon E. Hochberg</u>, <u>Richard O. Cunningham</u>, <u>Eric C. Emerson</u>) for Defendant-Intervenors and Plaintiffs USEC Inc. and United States Enrichment Corporation.

<u>Shaw Pittman LLP</u> (<u>Stephen E. Becker</u>, <u>Nancy A. Fischer</u>, <u>Sanjay J. Mullick</u>, <u>Joshua D. Fitzhugh</u>) for Plaintiff-Intervenors Ad Hoc Utilities Group.

**OPINION**

**Pogue, Judge**: Plaintiffs Eurodif, S.A., COGEMA, COGEMA Inc. (collectively, "Cogema"), Urenco Limited, Urenco Deutschland GmbH, Urenco Nederland B.V., Urenco (Capenhurst) Ltd. and Urenco, Inc. (collectively, "Urenco"),[1] challenge the final affirmative antidumping and countervailing duty determinations of the Department of Commerce ("the Department" or "Commerce") with regard to low enriched uranium ("low enriched uranium" or "LEU") from France, Germany, the Netherlands, and the United Kingdom.[2]

---

[1] Plaintiffs appear alternatively as Defendant-Intervenors in actions brought by USEC Inc. and the United States Enrichment Corporation challenging these final determinations. These actions have been consolidated as Court Numbers 02-00221, 02-00227, 02-00229, and 02-00233, and the parties have submitted cross-motions for judgment on the agency record. The motions raise certain "general issues" which are addressed here. Pursuant to this Court's Scheduling Order of August 5, 2002, the parties have initially submitted opening briefs on these "general issues."

[2] The challenged determinations are <u>Low Enriched Uranium from France</u>, 67 Fed. Reg. 6680 (Dep't Commerce Feb. 13, 2002) (notice of amended final determination of sales at less than fair value and antidumping duty order); <u>Low Enriched Uranium from France</u>, 66 Fed. Reg. 65,877 (Dep't Commerce Dec. 21, 2001) (final determination of sales at less than fair value) ("<u>LEU from France</u>"); <u>Low Enriched Uranium from France</u>, 67 Fed. Reg. 6689 (Dep't Commerce Feb. 13, 2002) (notice of amended final determination and notice of countervailing duty order); <u>Low Enriched Uranium from France</u>, 66 Fed. Reg. 65,901 (Dep't Commerce Dec. 21, 2001) (notice of final affirmative countervailing duty determination); <u>Low Enriched Uranium from Germany, the Netherlands, and the United Kingdom</u>, 67 Fed. Reg. 6688 (Dep't Commerce Feb. 13, 2002) (notice of amended final determinations and notice of countervailing duty orders); <u>Low Enriched Uranium from Germany, the Netherlands and the United Kingdom</u>, 66 Fed.

Plaintiffs assert that the antidumping and countervailing duty laws
do not apply to certain uranium enrichment transactions because the
contractual arrangements involve purchases of enrichment services,
rather than purchases of LEU as merchandise, and services fall
outside the scope of the antidumping and countervailing duty laws.
The Ad Hoc Utilities Group ("AHUG"), an association of twenty-two
United States utilities that are consumers of low enriched uranium,
seeks to intervene as of right in this action. See Mem. Supp. AHUG
Mot. Intervene at 1 ("AHUG Intervention Mem.").  This Court
exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  For
the reasons discussed below, we find that Commerce's determinations
are neither supported by substantial evidence in the record nor in
accordance with law.

## Background

On December 7, 2000, USEC, Inc. and its wholly-owned
subsidiary United States Enrichment Corporation (collectively,
"USEC"), petitioned the Department of Commerce for initiation of
antidumping and countervailing duty investigations into imports of
low enriched uranium from France, Germany, the Netherlands, and the
United Kingdom.  On December 21, 2001, Commerce issued its final

Reg. 65,903 (Dep't Commerce Dec. 21, 2001) (notice of final
affirmative countervailing duty determinations).

affirmative determinations in the antidumping and countervailing duty investigations of LEU from France and in the countervailing duty investigations of LEU from Germany, the Netherlands, and the United Kingdom. See LEU from France, 66 Fed. Reg. at 65,877; Low Enriched Uranium from France, 66 Fed. Reg. 65,901 (Dep't Commerce Dec. 21, 2001) (notice of final affirmative countervailing duty determination); Low Enriched Uranium from Germany, the Netherlands, and the United Kingdom, 66 Fed. Reg. 65,903 (Dep't Commerce Dec. 21, 2001) (notice of final affirmative countervailing duty determinations).

The antidumping and countervailing duty investigations initiated upon the petition of USEC covered "all low enriched uranium (LEU). LEU is enriched uranium hexafluoride ($UF_6$) with a $U^{235}$ product assay of less than 20 percent that has not been converted into another chemical form, such as $UO_2$, or fabricated into nuclear fuel assemblies, regardless of the means by which the LEU is produced." LEU from France, 66 Fed. Reg. at 65,877; see also Petition for the Imposition of Antidumping and Countervailing Duties on Low Enriched Uranium from France, Germany, the Netherlands and the United Kingdom, Jt. App. Tab 2-A at JA-1011-12 (stating the scope of the petition) ("Petition"). Low enriched uranium is a good, classifiable under headings 2844.20.0020, 2844.20.0030, 2844.20.0050, and 2844.40.00 of the Harmonized Tariff System of the United States ("HTSUS"). See LEU from France, 66

Fed. Reg. at 65,877; Petition, Jt. App. Tab 2-A at JA-1012-13.  All
parties to this action acknowledge that LEU itself is a good, and
that trade in LEU may be subject to the application of the unfair
trade laws.  See, e.g., LEU from France, 66 Fed. Reg. at 65,878
("{W}e found, and no party disputed, that LEU entering the United
States constitutes a good, the tangible yield of a manufacturing
operation."); Pls.' Opening Br. Supp. Mot. J. Agency R. at 14
("Pls.' Opening Br.").[3]

Low enriched uranium is used to produce nuclear fuel rods,
which are used in nuclear reactors to produce electricity.  See LEU
from France, 66 Fed. Reg. at 65,879; Def.'s Resp. Opp'n Pls.' Mot.
J. Agency R. at 5 ("Def.'s Resp.").  Enrichment is the process by
which the percentage of the fissionable isotope $U^{235}$ contained in
uranium is increased.  See, e.g., Pls.' Opening Br. at 9-10; Def.'s
Resp. at 4.  Natural uranium contains approximately 0.711 percent
of $U^{235}$; most nuclear utilities in operation require fuel with a $U^{235}$

---

[3] Title 19 U.S.C. § 1673 authorizes Commerce to impose
antidumping duties where it "determines that a class or kind of
foreign merchandise is being, or is likely to be, sold in the
United States at less than its fair value."  19 U.S.C. §1673
(2000).  The language of the statute requires that there be a
sale or likely sale at less than fair value in order for there to
be a final determination.  See 19 U.S.C. § 1673d(a)(1) ("{T}he
administering authority shall make a final determination of
whether the subject merchandise is being, or is likely to be,
sold in the United States at less than its fair value.").  The
Department interprets the statute to apply also to investigations
of merchandise entered into the United States for "consumption."
LEU from France, 66 Fed. Reg. at 65,878.  We will assume,
arguendo, that Commerce's interpretation is a reasonable one.

concentration or "assay" between three and five percent.  Pls.'
Opening Br. at 9; Def.'s Resp. at 4-5.

The production of nuclear fuel involves: (1) mining uranium
ore; (2) milling and/or refining the ore into uranium concentrate,
referred to as natural uranium ($U_{308}$); (3) converting the natural
uranium into uranium hexafluoride ($UF_6$), or "feed uranium;" (4)
enriching uranium hexafluoride to create low enriched uranium; and
(5) using the low enriched uranium to fabricate nuclear fuel rods
for use in nuclear reactors.  See Pls.' Opening Br. at 9; Def.'s
Resp. at 3-5; LEU from France, 66 Fed. Reg. at 65,879.  The process
of enrichment results in the creation of LEU, with its higher
concentration of $U^{235}$, and depleted uranium or uranium "tails."
Pls.' Opening Br. at 10; LEU from France, 66 Fed. Reg. at 65,879.

Nuclear utilities employ two types of contracts for procuring
LEU from uranium enrichers.  One is a contract for enriched uranium
product ("EUP contract"), in which the utility simply purchases LEU
from the enricher.  See LEU from France, 66 Fed. Reg. at 65,878,
65,885; Pls.' Opening Br. at 13; Def.'s Resp. at 5.  In an EUP
contract, the price paid for the LEU covers all elements of the
LEU's value, including the feed uranium and the effort expended to
enrich it.  Transcript of Dep't of Commerce Hearing (Oct. 31,
2001), Jt. App. Tab 6-A at 46 ("Hrg. Trans."); Pls.' Opening Br. at
13.  All parties to this action agree that sales of enriched
uranium product are sales of merchandise subject to the antidumping

and countervailing duty laws.  <u>See, e.g.</u>, Pls.' Opening Br. at 14

("Movants do not question the application of the antidumping and

countervailing duty laws to the sale of LEU.").

The second type of contract provides for the purchase of

"separative work units" ("SWU") and also provides for the delivery

by the utility of a quantity of feed uranium to the enricher.  <u>LEU</u>

<u>from France</u>, 66 Fed. Reg. at 65,878, 65,884-85; Pls.' Opening Br.

at 11-12; Def.'s Resp. at 5.   A "separative work unit" is a

measurement of the amount of energy or effort required to separate

a given quantity of feed uranium into LEU and depleted uranium, or

uranium "tails," at specified assays.  <u>See</u> <u>LEU from France</u>, 66 Fed.

Reg. at 65,884; Pls.' Opening Br. at 10 & n. 15; Def.'s Resp. at 5.

In an SWU contract, the precise quantity of LEU purchased is not

initially specified.   Rather, the contract specifies the general

terms of the transaction.  Notices given during the contract term

specify the quantity of SWUs, the product assay, and the tails

assay.  These specifications determine the material characteristics

of the resultant LEU.   <u>LEU from France</u>, 66 Fed. Reg. at 65,884;

Pls.' Opening Br. at 11-12; Resp. Br. of USEC, Inc. Opp'n

Cogema/Urenco Mot. J. Agency R. at 18 ("USEC Resp.").

Specification of the product and tails assays by means of the

notices given during the contract term permits the utility to

determine how many SWUs it will pay for and how much feed uranium

it will provide to the enricher.  <u>See</u> Pls.' Opening Br. at 12 &

n.20; USEC Resp. at 18; Hrg. Trans., Jt. App. Tab 6-A at 45-46.
This allows the utility to "optimize the relative amounts of money
and uranium it must provide for the LEU it will receive."  USEC
Resp. at 18; see also id. at 7 ("{T}he utility customer, by
specifying the product assay and transactional tails assay . . .
can control the total price it will pay and the amount of natural
uranium it will provide."); Hrg. Trans., Jt. App. Tab 6-A at 45-46.

Feed uranium is fungible.  See, e.g., USEC Resp. at 17.
Therefore, the specific feed uranium provided by a utility customer
need not be used to produce LEU for that customer.  See id. at 16
& n.21.  Rather, enrichers maintain inventories of feed uranium,
which is not segregated according to source or ownership.  Any
uranium held by the enricher may be used to produce LEU for any
customer.  Id. at 17; Def.'s Resp. at 5-6.

Utilities purchase feed uranium from third parties,[4] and prior
to delivering the feed uranium to the enricher, the utilities have
title, risk of loss, power to alienate or sell, and use and
possession of the feed uranium.  Title to feed uranium supplied to
the enricher remains with the utility customer until the LEU is
delivered, at which time title to the LEU is transferred to the
utility.  One contract states, for example, that "{t}itle to the
Feed Material shall remain with {the utility} until the {LEU}

_____

[4] Nothing in the record suggests that the parties from whom
utilities purchase the feed uranium are in any manner related to
the enrichers.

Delivery associated with such Feed Material . . . at which time the Feed Material shall be deemed to have been enriched; whereupon {the utility} sha{ll} have title to such {LEU} associated with such Feed Material and title to such Feed Material will be extinguished." Uranium Enrichment Services Contract between [            ] and Urenco, Jt. App. Tab 3-F at JA-1364; see also Uranium Enrichment Services Contract between [                              ] and Urenco, Jt. App. Tab 3-G at JA-1399. Pursuant to the SWU contracts, risk of loss or damage to the feed uranium, as well as use and possession, pass from the utility to the enricher upon delivery of the feed uranium to the enricher. Uranium Enrichment Services Contract between [         ] and Urenco, Jt. App. Tab 3-F at JA-1364; see also Uranium Enrichment Services Contract between [    ] and Urenco, Jt. App. Tab 3-G at JA-1399; Transcript of Oral Argument at 35 (Feb. 11, 2003) ("Oral Arg. Trans."). However, the enricher does not obtain title to the feedstock; rather, actual title is at all times with the utility. See, e.g., Oral Arg. Trans. at 34. Nor does the enricher have the power to sell a utility's feedstock to a third party. Id. at 35. Moreover, it appears clear on this record that at the moment when the LEU is delivered to the utility by the enricher, the utility has title to and ownership of the LEU. See Uranium Enrichment Services Contract between [            ] and Urenco, Jt. App. Tab 3-F at JA-1361 (indicating that title to the LEU and all risk of loss or damage to

pass from the enricher to the utility customer upon delivery of the

LEU by the enricher); see also Uranium Enrichment Services Contract

between [    ] and Urenco, Jt. App. Tab 3-G at JA-1401.  The feed

uranium does not become an asset of the enricher, nor is it ever

reflected as such on the enricher's books and records.[5]  See, e.g.,

Oral Arg. Trans. at 38.  The contractual arrangement described

above, in which utilities supply feed uranium and pay for the

separative work performed as measured in SWUs, long predates the

initiation of the challenged investigations.  See, e.g., Hrg.

Trans., Jt. App. Tab 6-A at 43-45.  During the 1960s and 1970s, the

U.S. Department of Energy had a monopoly on enrichment services,

but offered no other services relating to the production of nuclear

fuel.  See id. at 43.  Consequently, utilities purchased enrichment

services from the Department of Energy, but purchased feedstock

from third parties.  Id. at 43-45.  In summary, utilities contract

---

[5] Commerce verified the foreign enrichers' records, which did not reflect payments for customer-provided uranium.  Oral Arg. Trans. at 38.  Furthermore, even though USEC has represented that, as an enricher, it receives feed uranium as consideration or "payment-in-kind" for the supply of LEU, USEC has required its utility customers to pay all property tax on what it views, correctly, as the "customer's feed."  See Letter from Weil, Gotshal & Manges LLP to Hon. Norman Y. Mineta (Dec. 20, 2000) at Ex. 2, Letter from USEC to Enrichment Customers (Nov. 19, 1998), Jt. App. Tab 5-B at JA-1885 ("USEC Property Tax Letter") ("USEC will report all the property that it owns at the two {gaseous diffusion plants} and will pay property tax accordingly.  USEC does not intend to report any $UF_6$ to which it does not hold legal title.").  The record does not indicate that the enrichers depreciated the customer-owned feed uranium or otherwise treated it as an asset.

for each step of the nuclear fuel production process, including for enrichment.  Id.

Commerce found during its investigations that enrichers were producers of LEU for purposes of the less-than-fair-value determination.  In reaching its affirmative antidumping and countervailing duty determinations, Commerce concluded that EUP and SWU contracts were "functionally equivalent," in that "the overall arrangement under both types of contracts is, in effect, an arrangement for the purchase and sale of LEU."  LEU from France, 66 Fed. Reg. at 65,884-85.  The agency found that (1) the enrichment process is the "most significant manufacturing operation involved in the production of LEU" and that "it is the enricher who creates the essential character of LEU," LEU from France, 66 Fed. Reg. at 65,884; (2) the enrichers fully control the enrichment process, including the "level of usage of the natural uranium provided by the utility company," and therefore "cannot be considered tollers {or subcontractors} in the traditional sense under the regulation," id.; and (3) U.S. utility companies do not maintain production facilities for the enrichment of uranium.  Id.

Plaintiffs argue that SWU contracts are transactions in services and therefore not subject to the antidumping and countervailing duty laws.  See, e.g., Pls.' Opening Br. at 7-9. Plaintiffs further assert that the petitions were not filed on behalf of the United States industry.  Id. at 9.  AHUG joins the

plaintiffs in these assertions.  See AHUG Intervention Mem. at 5-6;

AHUG Opening Br. Supp. Mot. J. Agency R. at 7-8("AHUG Opening

Br.").   AHUG also claims that it is entitled to intervene as of

right because its members are producers of LEU.  AHUG Intervention

Mem. at 5.

## Standard of Review

This Court will sustain Commerce's determinations unless they

are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."   19 U.S.C. §

1516a(b)(1)(B)(i).

"Substantial evidence" is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal

citation omitted); Micron Tech., Inc. v. United States, 117 F.3d

1386, 1393 (Fed. Cir. 1997).  "{T}he possibility of drawing two

inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial

evidence."   Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

A decision will be reviewed on the grounds invoked by the agency,

see SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), and the Court

may "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned."   Bowman Transp., Inc. v. Ark.-

Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).   The Court's

function is not to re-weigh the evidence, but to ascertain whether the agency's determination is supported by substantial evidence on the record. Matushita Elec. Indus. Corp. v. United States, 750 F.2d 927, 936 (1984).

## Discussion

I.   **The Tolling Regulation, 19 C.F.R. § 351.401(h), and Commerce's Prior Decisions Related Thereto**[6]

Title 19 U.S.C. § 1673 provides that antidumping duties may be imposed on imported merchandise where "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than fair value" and imports, sales, or likely sales of that merchandise result in injury or the threat of injury to the domestic industry, or in the material retardation of the establishment of the domestic industry. 19 U.S.C. § 1673.[7] In

---

[6] Commerce argues that the issue of the applicability of the Department's tolling regulation is not a "general issue" and should therefore be postponed to a later stage in the proceeding. As we made clear in the Scheduling Order for this matter, issues which are not general include "challenges to the Department of Commerce's calculation results and methods." Scheduling Order at 5. While the initial applicability of the tolling regulation also has implications for the Department's calculation results and methods, it is more appropriately addressed as a general issue affecting the Department's threshold determinations. Accordingly, we address it here.

[7] The statute states that antidumping duties shall be imposed where

      (1) . . . a class or kind of foreign merchandise is
   being, or is likely to be, sold in the United States at less

order to determine whether merchandise is being sold or is likely

to be sold in the United States at less than fair value, Commerce

compares the merchandise's normal value, or the price at which the

merchandise is first sold for consumption in the exporting country,

to the export price or constructed export price, which represent

the price of the good when sold in or for export to the United

States.[8]  See 19 U.S.C. § 1673; 19 U.S.C. § 1677a; 19 U.S.C. §

_____

> than fair value, and
> > (2) the Commission determines that —
> > > (A) an industry in the United States —
> > > > (i) is materially injured, or
> > > > (ii) is threatened with material injury,
> > > or
> > > (B) the establishment of an industry in the
> > > United States is materially retarded,
>
> by reason of imports of that merchandise or by reason
> of sales (or the likelihood of sales) of that
> merchandise for importation.

19 U.S.C. § 1673.  "The purpose underlying the antidumping laws
is to prevent foreign manufacturers from injuring domestic
industries by selling their products in the United States at less
than 'fair value,' i.e., at prices below the prices the foreign
manufacturers charge for the same products in their home
markets."  Torrington Co. v. United States, 68 F.3d 1347, 1352
(Fed. Cir. 1995).

> [8] "Export price" is defined as
>
> > the price at which the subject merchandise is first sold
> > (or agreed to be sold) before the date of importation by
> > the producer or exporter of the subject merchandise
> > outside of the United States to an unaffiliated purchaser
> > in the United States or to an unaffiliated purchaser for
> > exportation to the United States.

19 U.S.C. § 1677a(a).  "Constructed export price" is defined as

> the price at which the subject merchandise is first sold

1677b(a).  In order to determine export price or constructed export price, Commerce must determine which company is the producer or exporter of the merchandise.  See Taiwan Semiconductor Mfg. Co. v. United States, 25 CIT __, __, 143 F. Supp. 2d 958, 966 (2001) ("In order to make a less-than-fair-value determination, Commerce must first determine the exporter or producer of the subject merchandise who controls the export price (or constructed export price) that Commerce compares to normal values to determine dumping margins.").

In determining who is the producer or exporter of subject merchandise, one factor Commerce considers is whether the merchandise is manufactured under a tolling or subcontracting arrangement.  Title 19 C.F.R. § 351.401(h) states that Commerce "will not consider a toller or subcontractor to be a manufacturer or producer where the toller or subcontractor does not acquire ownership, and does not control the relevant sale, of the subject merchandise or foreign like product."[9]  19 C.F.R. § 351.401(h).

_____

(or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter.

19 U.S.C. § 1677a(b).

[9] "Relevant sale" is "the first sale in the distribution chain by the company that is in a position to set the price of the product, and by doing so, to sell at less than fair value in or to the U.S. market."  Taiwan Semiconductor, 143 F. Supp. 2d at 966 (quoting Response to Court Remand, Taiwan Semiconductor Mfg. Corp., Ltd. v. United States (Dep't Commerce June 30, 2000)).

The regulation sets out "certain conditions under which {the agency} will not find that a toller or subcontractor is the producer of the subject merchandise." Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. 32,810, 32,813 (Dep't Commerce June 16, 1998) (final results of antidumping duty administrative review). "{T}he purpose of the tolling regulation is to identify the seller of the subject merchandise for purposes of establishing export price, constructed export price, and normal value." LEU from France, 66 Fed. Reg. at 65,878. As observed by this Court, "Commerce's construction of 'producer,' as memorialized in {the regulation}, emphasizes three factors: (1) ownership of the subject merchandise; (2) control of the relevant sale . . . ; and (3) control of production of the subject merchandise." Taiwan Semiconductor Mfg. Co., 25 CIT at __, 143 F. Supp. 2d at 966. Thus, under the regulation, Commerce will not find tollers or subcontractors to be producers where such toller or subcontractor does not acquire ownership and does not control the relevant sale of the subject merchandise or foreign like product. The regulation "does not provide a basis to exclude merchandise from the scope of an investigation," LEU from France, 66 Fed. Reg. at 65,878, and "does not purport to address all aspects of an analysis of tolling arrangements." Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 32,813. In making its producer determination, Commerce is "not restricted to the four corners of the contract" and will "look at

the totality of the circumstances presented." Id.

Commerce has noted that "{t}ypically, the subcontracting, or tolling, addressed by this practice involves a contractor who owns and provides to the subcontractor a material input and receives from the subcontractor a product that is identifiable as subject merchandise." Response to Court Remand, Taiwan Semiconductor Mfg. Corp., Ltd. v. United States, Jt. App. Tab 7-A at JA-2604 (Dep't Commerce June 30, 2000) ("SRAMS Remand Response"). The basis for treating the toller or subcontractor as a service provider and not the producer of the good is that the toller's price represents only the price for "some processing of the subject merchandise," not the "full cost of manufacturing."[10] Polyvinyl Alcohol Mem., Jt. App. Tab 7-F at JA-2730 (stating that Commerce prefers not to use

---

[10] Commerce stated that

> Continuing to base the margin methodology on a toller's prices and/or costs for tolling only raises the issue as to whether such comparisons are consistent with the statute in determining the appropriate bases for normal value and export price, the definition of subject merchandise, and how we calculate dumping margins. The statute requires that we base comparisons on the price of the subject merchandise sold in the U.S. to the price of the subject merchandise sold to the home or third country markets, not the price of some processing of the subject merchandise. Where cost of production and/or constructed value analysis is necessary, the statute requires that we calculate the full cost of manufacturing, not part of the cost of manufacture of the subject merchandise.

Dep't of Commerce Mem. from Team to Barbara R. Stafford, Treatment of DuPont's Sales of Polyvinyl Alcohol Tolled by Chang Chun Jt. App. Tab 7-F at JA-2730 (Aug. 8, 1995) ("Polyvinyl Alcohol Mem.").

tollers as respondents where a toller's price for the good does not "capture all the costs of production for producing the subject merchandise, as required by the statute"). Rather, the producer of the merchandise must be the company that "bears all essential costs from the inception of production through the time of the sale to the first customer. Because its pricing represents all elements of value, . . . this entity functions as the 'price setter' or potential price discriminator." SRAMS Remand Response, Jt. App. Tab 7-A at JA-2604.

In Static Random Access Memory Semiconductors from Taiwan, 63 Fed. Reg. 8,909 (Dep't Commerce Feb. 23, 1998) (notice of final determination of sales at less than fair value) ("SRAMS from Taiwan"), a foundry manufactured SRAM wafers using a design and design mask supplied by a design house. The design house developed the design, which was the crucial element in the production of the SRAM wafer; retained ownership of the design as intellectual property; "arrange{d} and pa{id} for the production of" the design mask; and "{told} the foundry what and how much to make." SRAMS from Taiwan, 62 Fed. Reg. 51,442, 51,444 (notice of preliminary determination of sales at less than fair value). Commerce concluded that the foundry, TSMC, was a toller, or subcontractor, rather than the producer of the SRAMS. Pursuant to this Court's instruction to explain why it treated the foundry in SRAMS from Taiwan as a service provider and not the producer of the

merchandise, Commerce stated that

> although a subcontractor may deliver to the contractor a product which, based on its characteristics, is subject merchandise, the price paid to the subcontractor may not represent the entire value of the subject merchandise, but merely represents a portion of that value. In fact, in most subcontracting arrangements, the contractor already owns an essential portion of the product, and thus the price paid is only for the work performed by the subcontractor; that is, the sale by the subcontractor is only a sale of the service it performed (and any inputs provided). Under these circumstances, we find that it is not appropriate to equate the price of a subcontractor's services (and material inputs) with the price of subject merchandise in a dumping analysis. Indeed, we do not consider the "sale" between the subcontractor and such a contractor to be a sale of subject merchandise at all. Rather, it is a sale of certain inputs and subcontracting services. It is the contractor's subsequent sale which is the relevant sale because that party owns the merchandise in its entirety and thus its sales price represents the full value of the subject merchandise.

SRAMS Remand Response, Jt. App. Tab 7-A at JA-2604. The agency noted that "the price from TSMC did not include an essential component of the product. Consequently, TSMC did not sell subject merchandise, but rather only sold inputs and fabrication services." Id. at JA-2605. The "essential component" not present in TSMC's pricing was the cost of the wafer design and design mask, which were provided to TSMC by the contractor. Id. at JA-2604-05.

Commerce further stated in the SRAMS Remand Response that

> we believe that the entity controlling the wafer design in effect controls production in the SRAMS industry. The design house performs all of the research and development for the SRAM that is to be produced. It produces, or arranges and pays for the production of, the design mask. At all stages of production, it retains ownership of the design and design mask. The design house then subcontracts the production of processed wafers with a

> foundry and provides the foundry with the design mask. It tells the foundry what and how much to make. The foundry agrees to dedicate a certain amount of its production capacity to the production of the processed wafers for the design house. The foundry has no right to sell those wafers to any party other than the design house unless the design house fails to pay for the wafers. Once the design house takes possession of the processed wafers, it arranges for the subsequent steps in the production process. The design of the processed wafer is not only an important part of the finished product, it is a substantial element of production and imparts the essential features of the product. The design defines the ultimate characteristics and performance of the subject merchandise and delineates the purposes for which it can be used.

SRAMS Remand Response, Jt. App. Tab 7-A at JA-2603. Commerce stated that it considered the foundry to be a subcontractor because "it did not acquire ownership of the SRAM design or the design mask, nor did it control the subsequent sale of the wafers." Id.

In Polyvinyl Alcohol from Taiwan, Commerce determined that under one contractual arrangement, the manufacturer of the subject merchandise, Chang Chun, was engaged as a toller or subcontractor, and therefore was not the producer of the subject merchandise for purposes of calculating export or constructed export price. The contractor, DuPont, manufactured the primary input, shipped it to Taiwan for processing by Chang Chun according to specifications supplied by DuPont, and exported it from Taiwan back to the United States and to third countries. See Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. 6,526, 6,527 (Dep't Commerce Feb. 9, 1998) (preliminary results of antidumping duty administrative review);

Polyvinyl Alcohol Mem., Jt. App. Tab 7-F at JA-2727.  Commerce

determined that under these circumstances, DuPont was the producer

of the subject merchandise.  Polyvinyl Alcohol from Taiwan, 63 Fed.

Reg. at 6,527.  Like the design house in SRAMS from Taiwan, DuPont

(1) coordinated all aspects of the production of the good and (2)

supplied materials to the subcontractor to be used in the

manufacturing process.[11]  See Polyvinyl Alcohol from Taiwan, 63 Fed.

Reg. at 6,527 (preliminary results of antidumping duty

administrative review); Polyvinyl Alcohol from Taiwan, 63 Fed. Reg.

at 32,817 (final results of antidumping duty administrative

review); Polyvinyl Alcohol Mem., Jt. App. Tab 7-F at JA-2727.

     Finally, in Certain Forged Stainless Steel Flanges from India,

58 Fed. Reg. 68,853 (Dep't Commerce Dec. 29, 1993) (notice of final

---

[11] Notably, in a second contractual setting in Polyvinyl Alcohol from Taiwan, Commerce determined that the same manufacturer, Chang Chun, was the producer of the subject merchandise, while the other company, Perry, was determined to be an importer and reseller.  See Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 6,527.  The contractual arrangement under which Perry purchased and supplied input materials to Chang Chun was altered only after a finding of sales at less-than-fair-value by Chang Chun.  Id.  Perry purchased the inputs from a Chang Chun affiliate and arranged for their delivery to Chang Chun.  Id. Perry did not and had never manufactured any chemicals or chemical inputs; it was merely an importer and reseller.  Id. The crucial finding in Polyvinyl Alcohol from Taiwan was that, under the circumstances, Perry had simply restructured its payments to Chang Chun in an effort to circumvent the antidumping duties.  This is distinguishable from the instant case because here the utility purchases the feedstock from a party unrelated to the enricher, and therefore the purchase of the feedstock confers no economic benefit on the enricher.  The contract here is not simply a restructured purchase contract.

determination of sales at less than fair value), Commerce determined that Akai, a contractor that did not engage in manufacturing operations, was the producer of the subject merchandise. Id. at 68,855. Akai "purchase{d} and maintaine{d} title (during the entire course of production) to the raw materials used for the production of the vast majority of the flanges," and also "direct{ed} and control{led} the manufacturing process" by providing specifications for the finished merchandise. 58 Fed. Reg. at 68,856. Commerce noted that "for the vast majority of the flanges produced . . . Akai controls the costs for all elements incorporated in the production of the flanges." Id.

The circumstances of the instant case largely resemble the tolling or subcontracting arrangements seen in these earlier determinations. Like Akai in Certain Forged Stainless Steel Flanges from India, the utilities direct and control the process of producing the merchandise, i.e. nuclear fuel. See, e.g., Hrg. Trans., Jt. App. Tab 6-A at 44-45. Using contractors at each step, they coordinate the production of uranium, LEU, and fuel rods. Id. As in Polyvinyl Alcohol from Taiwan, where the contracting company provided the material to be processed, the utilities provide the feed uranium to the enrichers and pay separately for the work performed, measured in SWUs. The utilities, by supplying the feed uranium, accept the risk of fluctuations in the price of $UF_6$ and can make the decision as to how much $UF_6$ versus how many SWUs to

purchase in a given transaction. <u>See</u> Pls.' Opening Br. at 13 n.22 & sources cited therein. The contracts require the utility customer to provide the quantity of feed necessary to produce the desired quantity and assays of LEU. <u>See, e.g.</u>, French CVD Verification Exhibit C-1 (Oct. 23, 2001), [

], Jt. App. Tab 4-A at JA-1507. As noted above, the utility customer retains title to the feed uranium until it is enriched. <u>See, e.g.</u>, Uranium Enrichment Services Contract between [        ] and Urenco, Jt. App. Tab 3-F at JA-1364; USEC Property Tax Letter, Jt. App. Tab 5-B at JA-1885-86 (noting that the utility customer is responsible for paying property taxes due on feed uranium stored by USEC on the utility's behalf). Upon enrichment and delivery of LEU, the title to the feed is considered extinguished and the customer gains title to the LEU. Significantly, the contracts for LEU state that once the separative work is performed and the LEU is delivered, "the Feed Material shall be deemed to have been enriched; whereupon {the utility customer} sha{ll} have title to such {LEU} associated with such Feed Material and title to such Feed Material will be extinguished." Uranium Enrichment Services Uranium Enrichment Services Contract between [        ] and Urenco, Jt. App. Tab 3-F at JA-1364; <u>see also</u> Uranium Enrichment Services Contract between [   ] and Urenco, Jt. App. Tab 3-G at JA-

1399.[12] These contractual provisions acknowledge the fungible nature of feed uranium while establishing a legal fiction that the enrichment process will be performed on the uranium provided by the customer. The SWU contracts indicate that the provision of feed uranium is not treated by the parties as a payment in kind, but the provision of specific material, owned by the customer, to be enriched. Accordingly, the contractual provisions, without more, do not support Commerce's interpretation that the provision of feed uranium is substantively a payment in kind. See LEU from France, 66 Fed. Reg. at 65,884-85 (indicating that while Commerce recognized that the provision of feed uranium under SWU contracts "may not be a payment-in-kind in the formal sense," it is substantively a payment in kind and is part of an "arrangement between buyer and seller . . . dedicated to the delivery of LEU").

The designation by the utilities of particular assays for the LEU and for uranium tails is analogous to DuPont's provision of specifications to Chang Chun in Polyvinyl Alcohol from Taiwan, and to Akai's control of the specifications in Certain Forged Stainless Steel Flanges from India. The designation of quantities and assays is based on (1) the design of the core reactor, which determines

---

[12] Defendant United States cites NSK Ltd. v. United States, 115 F.3d 965, 975 (Fed. Cir. 1997), for the proposition that a sale exists when there is "a transfer of ownership to an unrelated party and consideration." NSK Ltd., 115 F.3d at 975; Def.'s Resp. at 58-59. As there is no finding that the enrichers' rights rise to the level of ownership, NSK is inapplicable.

the level of $U^{235}$ needed by that reactor,[13] and (2) the utility's needs at a particular time, depending on its operating cycle and the amount of fuel that has been spent. See, e.g., AHUG Intervention Mem. at 11. The utilities provide these specifications to the enricher, which then produces LEU in the required quantities and assays.

Commerce has previously indicated that control over the specifications of the final product was sufficient control to be considered a producer. Companies that did not engage in actual manufacturing processes have previously been held to be producers of subject merchandise. In SRAMS from Taiwan, discussed supra, the design house subcontracted the manufacturing of the wafer to a foundry. The design house created the design, retained ownership of the design throughout the production process, and provided manufacturing specifications to the foundry. SRAMS from Taiwan, 63 Fed. Reg. at 8,918 ("The design house . . . subcontracts the production of processed wafers with a foundry and provides the foundry with the design mask. It tells the foundry what and how much to make.") (quoting internal decision memorandum); see also text pp. 18-20, supra. Commerce found that the design house was

_____

[13] AHUG states that "{t}he specific level of $U^{235}$ needed is determined by each utility, based on the reactor core design it develops for its own reactors. In developing this design, the utility determines the number of fresh fuel assemblies and corresponding enrichment level necessary to produce the energy it needs until the next scheduled refueling date." AHUG Intervention Mem. at 11.

the producer of the wafers.  Id. at 8,918-19.

In Certain Forged Stainless Steel Flanges from India, the petitioners claimed that Akai, a company that did not engage in manufacturing operations, could not be the producer of the subject merchandise.  58 Fed. Reg. at 68,855.  Commerce disagreed, stating that Akai was the producer of the subject merchandise because in addition to purchasing and retaining title to the raw materials used to produce the "vast majority" of the flanges, Akai also "direct{ed} and control{led} the manufacturing process insofar as it determines the quantity, size, and type of flanges to be produced."  58 Fed. Reg. at 68,856.  Commerce noted that "for the vast majority of the flanges produced . . . Akai controls the costs for all elements incorporated in the production of the flanges." Id.  Similarly, in Certain Pasta from Italy, 63 Fed. Reg. 53,641, 53,642 (Dep't Commerce Oct. 6, 1998) (preliminary results of new shipper antidumping duty administrative review), Commerce determined that the producer was a company that purchased all inputs, paid the subcontractor a processing fee, and maintained ownership of both the inputs and the final product at all times, as well as marketed the product and conducted product testing and marketing research.

Accordingly, if the text of 19 C.F.R. § 351.401(h) and Commerce's prior decisions were applied to the evidence on this record, the SWU contracts would be treated as contracts for the

performance of services, and the enrichers would be treated as tollers and the utilities as the producers of LEU. Here, however, Commerce determined that the enrichers were the producers, offering three primary reasons for distinguishing this case from its prior decisions in cases involving tolling services. First, the agency asserted that "the enrichment process is such a significant operation that it establishes the fundamental character of LEU." LEU from France, 66 Fed. Reg. at 65,884. Yet in earlier cases involving tolling, it has also been the toller that created the "essential character" of the finished good by transforming the raw materials or inputs into the subject merchandise. In Polyvinyl Alcohol from Taiwan, the subcontractor Chang Chun transformed the material provided by DuPont into the final good, polyvinyl alcohol. See 63 Fed. Reg. at 6,527 ("DuPont . . . produces the main input, vinyl acetate monomer ('VAM'), which it then ships to Taiwan. Under contract with Chang Chun, the VAM is then converted into subject merchandise."). In Certain Pasta from Italy, the toller manufactured the subject pasta from the inputs supplied by the producer. See 63 Fed. Reg. at 53,642 ("Corex reports that it: (1) purchases all of the inputs, (2) pays the subcontractor a processing fee, and (3) maintains ownership at all times of the inputs as well as the final product."). Here, the enricher transforms feed uranium into LEU. Yet, as in the earlier cases, while its operations do create the "essential character" of LEU,

the enricher does not acquire ownership over either the feed or the final product, and neither its operations nor its pricing account for the full value of the finished LEU.

Second, Commerce distinguished the instant case from prior cases on the ground that "the enrichers control the production process to such an extent that they cannot be considered tollers in the traditional sense under the regulation."[14] LEU from France, 66 Fed. Reg. at 65,884. However, tollers normally, and in prior cases, control the operational process by which they perform the tolling services. Like the contractor Akai in Certain Forged Stainless Steel Flanges from India, the utility controls the specifications of the final product. See 58 Fed. Reg. at 68,856 ("{W}e have determined that Akai is the producer of this merchandise. . . . Akai purchases and maintains title . . . to the raw materials used for the production of the vast majority of the

---

[14] Commerce based this distinction in part on its conclusion that "{t}he most important factor in determining whether the contract is fulfilled is whether the utilities receive the precise amount of LEU that results from the application of the SWU equation that is explicitly spelled out and agreed upon in the SWU contract." LEU from France, 66 Fed. Reg. at 65,884. In fact, the substantive provisions of the contracts are fulfilled by the purchase of the designated quantities of SWU, the enrichment of the uranium to the specified assay, and delivery of the LEU. See, e.g., Contract for Uranium Conversion and Enrichment Services between [                                  ] and Cogema, Inc., Jt. App. Tab 3-C at JA-1255-58; Contract for Uranium Enrichment Services between [                          ] and Cogema, Inc., Jt. App. Tab 3-E at JA-1297, JA-1299, JA-1301, JA-1303-05; Uranium Enrichment Services Contract between [          ] and Urenco, Jt. App. Tab 3-F at JA-1356.

flanges, and . . . directs and controls the manufacturing process insofar as it determines the quantity, size, and type of flanges to be produced."). As in Certain Forged Stainless Steel Flanges from India, the actual processes of creating the product are left within the control of the toller. See id.

Third, Commerce stated that "utility companies do not maintain production facilities for the purpose of manufacturing subject merchandise." LEU from France, 66 Fed. Reg. at 65,884. Yet under the circumstances of this case, the fact that the utilities do not maintain enrichment facilities does not appear to be significant. Commerce itself acknowledged the expense and technological sophistication involved in building and maintaining enrichment facilities. See id. (noting that each of the two technologies for enriching uranium feedstock, gaseous diffusion and centrifuge, "requires a huge financial investment in facilities and a technically skilled workforce. In fact, the centrifuge technology has been years in the making and has required millions of dollars in research. So highly specialized is it, and so expensive to develop, that three major European governments combined their resources to develop the technology and create Urenco."). Moreover, we note that the producers in SRAMS from Taiwan, Certain Pasta from Italy, and Certain Forged Stainless Steel Flanges from India did not maintain manufacturing facilities, and this fact did not prohibit the application of the tolling regulation. See SRAMS

Remand Response, Jt. App. Tab 7-A at JA-2603; Certain Pasta from Italy, 63 Fed. Reg. at 53,642; Certain Forged Stainless Steel Flanges from India, 58 Fed. Reg. at 68,855. Finally, while the enricher invests in the research and development necessary to develop and maintain separation facilities, we note that the foundry in SRAMS from Taiwan "conduct{ed} research and development related to process technology," but that this fact was not "controlling to {Commerce's} analysis." SRAMS Remand Response, Jt. App. Tab 7-A at JA-2606 n.3.

Commerce asserted in its final determination that "the overall arrangement, even under the SWU contracts, is an arrangement for the purchase and sale of LEU." LEU from France, 66 Fed. Reg. at 65,884. However, under any tolling arrangement, the "overall arrangement" is one for acquisition of a good, usually manufactured by the toller. Yet Commerce has previously distinguished toll-produced goods on the grounds that the toller does not acquire ownership, and the toller's price for its work does not represent the full value of the good. See, e.g., SRAMS Remand Response, Jt. App. Tab 7-A at JA-2603-04.

We cannot reconcile Commerce's prior distinctions between tolling services and sale of goods with the agency's statements in this case that EUP and SWU contracts are "functionally equivalent," and that "{i}t does not matter whether the producer/exporter sold subject merchandise as subject merchandise, or whether the

producer/exporter sold some input or manufacturing process that produced subject merchandise, as long as the result of the producer/exporter's activities is subject merchandise entering the commerce of the United States." LEU from France, 66 Fed. Reg. at 65,879, 65,885. Commerce's claim that the sole difference between enrichment transactions and sales of LEU under EUP contracts is the way such transactions are structured fails to take into account a critical difference between the two transactions: what is purchased.

Under EUP contracts, enrichers purchase their own uranium feed and enrich it for sale to the utilities as a complete product. Utilities pay the seller a price that reflects all elements of the value of the LEU: the value of the natural uranium and the amount of enrichment services, or SWU, performed.

Under SWU contracts, by contrast, the purchase price does not include the full value of the merchandise involved. Most significantly, such contracts do not include the cost or responsibility for providing the uranium feed, and no payment for the uranium is recognized on the enricher's financial statements, as would be the case if the enricher merely bought the uranium.[15]

---

[15] The apparent reason for this structure is to allow a utility to control costs by determining how much feedstock it supplies, versus how many SWUs it pays for. See, e.g., Pls.' Opening Br. at 10-12; AHUG Opening Br. at 11-12; Oral Arg. Trans. at 50, 57-58. No benefit flows to the enricher from the utility's supplying the feedstock.

These types of transactions thus do not contemplate the sale of a complete product. Instead, enrichment contracts specify that the only payment to be made by the utility is for the enrichment services to be provided, on a price-per-SWU basis.[16] While the SWU prices may include certain incidental costs, they do not include the significant cost of the natural uranium, which is approximately 35 percent of enriched uranium's total value. See Petition, Jt. App. Tab 2-A at JA-1016. Commerce has recognized that where the

---

[16] For example, the Uranium Enrichment Services Contract between [          ] and Urenco specifies as follows:

[




                                                                    ]

Uranium Enrichment Services Contract between [          ] and Urenco, Jt. App. Tab 3-F at 1366. Further, the [          ] under a Cogema enrichment contract provides as follows:

    12.3 [


              ]

Uranium Enrichment Services Contract between [
    ] and Cogema, Inc., Jt. App. Tab 3-E at JA-1308.

price paid for subject merchandise does not include the entire value of such merchandise, but instead only that portion of the value added by the services performed, there is no cognizable sale under the antidumping duty law.[17] Commerce's decision in the SRAMS Remand Response confirms this position. The statute requires a comparison of "the price of the subject merchandise sold in the U.S. to the price of the subject merchandise sold to the home or third country markets, not the price of some processing of the subject merchandise." Polyvinyl Alcohol Mem., Jt. App. Tab 7-F at JA-2730.

While Commerce correctly states that 19 C.F.R. § 351.401(h) does not "exempt merchandise from {antidumping} proceedings," LEU from France, 66 Fed. Reg. at 65,880, the regulation is applicable in determining who is the producer in order to determine export price or constructed export price. Thus, a determination that the enricher provides a tolling service would mean that the price charged by the enricher to the utility for the enrichment cannot form the basis of the export price for the purpose of determining dumping margins.

It is well established that Commerce is authorized to depart

---

[17] The record does not indicate that Commerce analyzed the pricing provisions of the SWU contracts, or the structure of SWU transactions, in order to distinguish them from the pricing or transactional patterns found in the earlier cases involving subcontracting or tolling arrangements and in which 19 C.F.R. § 351.401(h) was found to apply.

from its prior practice as long as the agency articulates a "reasoned analysis" which demonstrates that the departure is supported by substantial evidence and in accordance with law. Allegheny Ludlum Corp. v. United States, 24 CIT __, __, 112 F. Supp. 2d 1141, 1147 (2000) (quoting Motor Vehicles Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983)); see also Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT 173, 184-85, 6 F. Supp. 2d 865, 879-80 (1998) ("Commerce has the flexibility to change its position providing that it explain the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence."). Here, Commerce's decision not to apply the tolling regulation to a case that appears similar to earlier tolling cases, including SRAMS from Taiwan and Polyvinyl Alcohol from Taiwan, represents a departure from the practice authorized by a regulation "having the force and effect of law." Allied Signal Aerospace Co. v. United States, 28 F.3d 1188, 1191 (Fed. Cir. 1994). As such, Commerce's decision requires a more persuasive explanation than provided in the agency's determinations.

In summary, Commerce's determination that enrichers are producers and not tollers is against the weight of the evidence on the record and inconsistent with both the agency's regulations and its prior decisions involving tolling services. Commerce's reasons for distinguishing the instant case, and consequently for declining

to apply the tolling regulation, are not persuasive. Thus, Commerce's decision to treat these contracts as contracts for sales of a good is neither supported by substantial evidence nor in accordance with law.


## II.  Industry Support

In determining that the antidumping and countervailing duty petitions regarding low enriched uranium had the requisite industry support, Commerce determined that enrichers, but not utilities, were producers of the subject merchandise.[18]  See Low Enriched

---

[18] 19 U.S.C. § 1673a(b)(1) provides that

{a}n antidumping proceeding shall be initiated whenever an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title . . . .

19 U.S.C. § 1673a(b)(1).

19 U.S.C. § 1677(9) defines "interested party" as:

(A)  a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise,
. . . .
(C)  a manufacturer, producer, or wholesaler in the United States of a domestic like product,
(D)  a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,

<u>Uranium from France, Germany, the Netherlands, and the United Kingdom</u>, 66 Fed. Reg. 1,080, 1,081 (Dep't Commerce Jan. 5, 2001) (notice of initiation of antidumping duty investigations) ("Antidumping Initiation Notice"). Consequently, Commerce determined that petitioner USEC, as the sole domestic producer of LEU, "established industry support representing over 50 percent of total production of the domestic like product," and therefore the industry support requirement was fulfilled. <u>Id.</u>

Commerce employed a six-factor test used by the International Trade Commission to determine whether a company may be considered a "member of the domestic industry." Dep't Commerce Mem. from Melissa G. Skinner to Holly A. Kuga, <u>Determination of Industry Support for the Antidumping and Countervailing Duty Petitions on</u>

---

. . . .
(F)  an association, a majority of whose members is
     composed of interested parties described in
     subparagraph (C), (D), or (E) with respect to a
     domestic like product . . . .

19 U.S.C. § 1677(9).

In order to determine that a petition has the requisite industry support, Commerce must find that

     (i) the domestic producers or workers who support
the petition account for at least 25 percent of the
total production of the domestic like product, and
     (ii) the domestic producers or workers who support
the petition account for more than 50 percent of the
production of the domestic like product produced by
that portion of the industry expressing support for or
opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A).

Low Enriched Uranium from France, Germany, the Netherlands, and the United Kingdom, Jt. App. Tab 1-A at JA-0007-08 (Dec. 27, 2000) ("LEU Industry Support Mem."). The test "focuses upon 'the overall nature' of production-related activities in the United States, to determine whether production operations are sufficient for a company to be considered a member of the domestic industry." Id. at JA-0008.

Commerce determined that the utilities were not producers of LEU because

> {t}hese companies do not engage in any type of manufacturing activities related to the production of LEU: they make no claim to have any LEU manufacturing operations; no capital investment in production facilities; they add no value to the product through the performance of any manufacturing operations; and have no employees dedicated to manufacturing.

Id. (citing Brother Industries, Ltd. v. United States, 16 CIT 1106 (1992) aff'd, 1 F.3d 1253 (Fed. Cir. 1993)). Rather, Commerce determined that the utility companies are "purchasers and industrial users of LEU." Id.

Commerce further asserted that the tolling regulation, 19 C.F.R. § 351.401(h), does not apply to determine who is a producer for the purposes of industry support. See LEU Industry Support Mem., Jt. App. Tab 1-A at JA-0006. Commerce stated that

> we do not interpret section 351.401(h) . . . to be applicable to our determinations on industry support. Instead, . . . we find that section 351.401, including subsection (h) on tolling, was intended to "establish certain general rules that apply to the calculation of export price, constructed export price, and normal

value," and not for purposes of determining industry support. . . . Our interpretation that the tolling regulation is intended for purposes of calculating antidumping margins is further supported by the absence of any parallel provision on tolling in the CVD regulations.

Id. (internal footnotes omitted).

Commerce further noted that

In practice, moreover, the Department has never applied, nor relied upon, section 351.401(h) to determine industry support, with good reason. The purpose of the tolling regulation is to identify the party responsible for setting the price of subject merchandise sold to the United States. . . . By contrast, to determine industry support, the Department seeks to identify the entity or entities (or workers) that are engaged in the production or manufacture of the identical merchandise set forth in the petition. Thus, identifying the seller for purposes of respondent selection and identifying the domestic producers for purposes of industry support are separate questions that require different examinations for different purposes.

Id. at JA-0007.

Commerce's decision not to apply the tolling regulation to determine who is a producer in connection with its industry support determination is based on the agency's assessment of the purpose and context of the regulation. The Court acknowledges that the purpose of the tolling regulation is accurate calculation of export or constructed export price, and that the regulation does not arise in connection with the industry support determination. However, it is unclear from Commerce's explanation why the definition of "producer," a term that is not statutorily defined, should differ between one subsection of the statute and another. Furthermore, it

appears incongruous that Commerce may determine that the utility
companies are not producers of LEU for the purpose of the industry
support determination, but subsequently may determine, as a result
of applying the tolling regulation, that the same companies are
producers for the purpose of determining export price or
constructed export price.[19]  Where a term appears in multiple
subsections within a statute, we "presume that Congress intended
that the term have the same meaning in each of the pertinent
sections or subsections of the statute, and we presume that
Congress intended that Commerce, in defining the term, would define
it consistently."  SKF USA Inc. v. United States, 263 F.3d 1369,
1382 (Fed. Cir. 2001).  Commerce is permitted to apply different
definitions of such a statutory term only if it provides "an
explanation sufficient to rebut this presumption."  Id.

Consequently, as the Court is remanding the Department's

---

[19] When making an industry support determination, Commerce
identifies the producers that make up the domestic industry.  19
U.S.C. § 1673a(c)(4); 19 U.S.C. § 1677(4)(A) ("The term
'industry' means the producers as a whole of a domestic like
product, or those producers whose collective output of a domestic
like product constitutes a major proportion of the total domestic
production of the product.").  When Commerce identifies the
producer of subject merchandise for the purpose of determining
export price or constructed export price and calculating the
dumping margin, the agency is identifying a seller in the
ordinary course of trade.  See 19 U.S.C. § 1677b.  Although we do
not reach this issue, it would seem that if the word "producer"
were to have a different definition in the context of the
industry support determination than in the context of the export
price determination, the industry support definition should be
the more inclusive, not the more exclusive, because the purpose
of the provision is to identify the industry as a whole.

determination for reconsideration of its decision not to apply the tolling regulation, Commerce also will have the opportunity to reconsider the effect of the tolling regulation on its industry support determination.  If Commerce finds that the tolling regulation applies here, the agency must consider whether those entities determined to be "producers" under the tolling regulation are also "producers" for purposes of the industry support determination.  Should Commerce determine that this is not the case, and that, in effect, a different definition of "producer" applies in the industry support context than in the context of the export price calculation, the agency is directed to articulate an appropriate basis for such a conclusion.

## III. Applicability of the Countervailing Duty Statute

In deciding to apply the countervailing duty law to the subsidies it found to have benefitted Plaintiffs during the period of investigation, Commerce, relying on the same rationale it employed in applying the antidumping duty law, determined that because LEU was entering the United States for consumption, that merchandise was subject to countervailing duties:

> Similarly, in conducting countervailing duty investigations, {19 U.S.C. § 1671(a)(1)} requires the Department to impose duties if, inter alia, "the administering authority determines that the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture,

> production, or export of a class or kind of merchandise
> imported, or sold (or likely to be sold) for importation,
> in the United States."  We believe the statute is clear
> that, where merchandise from an investigated country
> enters the commerce of the United States, the law is
> applicable to such imports.

LEU from France, 66 Fed. Reg. at 65,879.  Commerce went on to note that "under the countervailing duty law, {19 U.S.C. § 1677(5)(E)(iv)} defines as a benefit the purchase of goods for more than adequate remuneration.  Because we have determined that SWU contracts involve the purchase of LEU, we determine that these transactions constitute the purchase of goods."   Id. at 65,883 n.7; see also 19 U.S.C. § 1677(5)(E)(iv).

We have already determined that Commerce's determination regarding the "functional equivalency" of EUP and SWU contracts is not supported by the record. Accordingly, we cannot sustain the Department's determination that for the purposes of applying the countervailing duty statute, SWU contracts involve the purchase of LEU.  Upon remand, the Department will have the opportunity to reconsider the application of its tolling regulations to the transactions at issue here. The Department therefore must reconsider its countervailing duty determinations in that context.

## IV. Intervention of the Ad Hoc Utilities Group

Intervention in antidumping and countervailing duty actions "is governed by Rule 24 of the Rules of this Court subject to the

limitations in 28 U.S.C. § 2631(j)."[20]   Rhone Poulenc, Inc. v. United States, 14 CIT 364, 365, 738 F. Supp. 541, 542 (1990) (citing Manuli Autoadesivi, S.p.A. v. United States, 9 CIT 24, 25, 602 F. Supp. 96, 97-98 (1985)).   Title 28 U.S.C. § 2631(j)(1) provides that "{a}ny person who would be adversely affected or aggrieved by a decision in a civil action pending in the Court of International Trade may, by leave of court, intervene in such action."   However, subsequent subparagraphs limit this right. Title 28 U.S.C. § 2631(j)(1)(B) provides that, "in a civil action under section 516A of the Tariff Act of 1930, only an interested party who was a party to the proceeding in connection with which the matter arose may intervene, and such person may intervene as a matter of right."   Additionally, under section 2631, "'interested party' has the meaning given such term in section 771(9) of the Tariff Act of 1930."  28 U.S.C. § 2631(k)(1).   That section defines "interested party" as, inter alia, "a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States."   19 U.S.C. § 1677(9)(E).

Intervention in an action before this Court implicates the

_____

[20]   USCIT Rule 24 provides, inter alia, that a party may intervene as of right in an action when it "claims an interest relating to the property or transaction which is the subject of the action and . . . the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."  USCIT R. 24(a).

Court's jurisdiction and authority. Consequently, it is the Court that determines who is an "interested party" for the purpose of intervention. As noted in Zenith Radio Corp. v. United States, "{t}here is no presumption of standing in an area where Congress has provided explicit instructions on the subject." 5 CIT 155, 156 (1983) (internal citation omitted). Furthermore, as the Court observed, Commerce's decision to permit a party to participate in its investigative process, "even if done in terms of recognizing them as 'interested parties,' cannot control the Court's understanding of a matter primarily related to the invocation of its powers of judicial review." Id. "The agenc{y's} receptiveness to participation by various parties does not generate standing for judicial review." Id. (internal citation omitted). This Court's decision as to whether AHUG's members are "interested parties" for purposes of intervention in the instant action does not depend upon the administrative determination as to the same question.[21]

---

[21] The government directs the Court's attention to Rhone Poulenc, Inc. v. United States, 14 CIT 364, 738 F. Supp. 541 (1990) in support of the proposition that this Court "is divided with respect to the question whether the agencies or the Court determines who is an 'interested party who was a party to the proceeding.'" Def.'s Resp. Opp'n AHUG Mot. Intervene at 11. In Rhone Poulenc, the Court determined whether a party was "an interested party who was a party to the proceeding," as required by 28 U.S.C. § 2631(j)(1)(B), by referring to Commerce's regulations governing who was a "party to the proceeding." Rhone Poulenc, 14 CIT at 365, 738 F. Supp. at 542. In Zenith Radio Corp., the Court denied a motion for intervention after determining that the applicants did not meet the statutory and regulatory definitions of interested parties. 5 CIT at 157. The applicants claimed that because the administrative agency had

AHUG participated in the administrative proceedings at issue here pursuant to 19 C.F.R. § 351.312, which permits "industrial users" of subject merchandise to submit "relevant factual information and written argument" to Commerce.  19 C.F.R. § 351.312(b).[22]  However, no provision of the statutes or regulations

---

accepted their participation in its proceeding, they had standing to intervene in the action before the Court.  The Court's decision in Zenith clarifies that, while the Court will look to the relevant statutes and regulations in determining who is eligible to bring or intervene in an action, the actions of the agency cannot bind the Court in connection with its determination of standing and the exercise of its jurisdiction.  Consequently, there is no conflict between the Court's decisions in Rhone Poulenc and in Zenith Radio Corp.

[22] Section 351.312 permits industrial users to "submit relevant factual information and written argument" under §§ 351.218(d)(3)(ii), (d)(3)(vi), and (d)(4), addressing sunset reviews; §§  351.301(b), (c)(1), and (c)(3), addressing time limits; §§ 351.309(c) and (d), which permit "any interested party or U.S. Government agency" (emphasis supplied) to submit written argument in antidumping and countervailing duty proceedings; and § 351.309(e), which permits comments in connection with expedited sunset reviews.  19 C.F.R. § 351.312(b).  The most pertinent section here is § 351.309, but it appears from the language of the regulation that AHUG would have to be an "interested party" within the meaning of the antidumping and countervailing duty statutes in order to make a submission.  However, it is unclear why § 351.312 would grant the right to participate to "industrial users," who presumably are not "interested parties," and yet cross-reference another subsection requiring interested party status.
       As USEC points out in its brief, USEC did not object to AHUG's participation in the administrative proceeding as an industrial user.  See Resp. Br. of USEC Opp'n AHUG Mot. Intervene at 5.  Additionally, the briefs submitted by both USEC and the Department of Justice in connection with AHUG's motion to intervene appear to assume that AHUG properly appeared in the administrative proceeding below.  As the regulation is unclear, the Court will assume that AHUG properly participated in the administrative proceeding under 19 C.F.R. § 351.312.

indicates that participation in the administrative proceeding as an "industrial user" is sufficient to meet the requirement of "party" to the proceeding under 28 U.S.C. § 2631.

Furthermore, we note that even if AHUG is considered to have been a "party" to the administrative proceeding within the meaning of 28 U.S.C. § 2631(j)(1)(B), the association still must meet the definition of "interested party," as required by 28 U.S.C. §§ 2631(j)(1)(B), 2631(k)(1). As noted earlier, "interested party" in this context is defined as, inter alia, "a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States." 19 U.S.C. § 1677(9)(E); see also 28 U.S.C. § 2631(k)(1).

Although Commerce acknowledged that the utility companies were "purchasers and industrial users of LEU," the agency determined they were not producers of LEU for purposes of industry support. LEU Industry Support Mem., Jt. App. Tab 1-A at JA-0008. Yet as we are remanding to Commerce the question of the applicability of the tolling regulation, the question whether AHUG's members are "producers" of LEU within the meaning of the statute remains unresolved. Moreover, as discussed earlier in this opinion, application of the tolling regulation would result in a finding that the utilities are producers of LEU. See supra text at 26-35; 19 C.F.R. § 351.401(h). Accordingly, AHUG's members may be "producers" within the meaning of 19 U.S.C. § 1677(9) and 28 U.S.C.

§ 2631(k)(1).

Significantly, AHUG members, as purchasers and users of LEU, could be adversely affected by a decision in the instant case. 28 U.S.C. § 2631(j). The association has actively participated, to the extent permitted, throughout the administrative investigation, and the views and concerns of AHUG's members may offer valuable insights in this litigation. Finally, AHUG's claims raise questions of law and fact common to those raised by the plaintiffs, who are mandatory parties here.

As noted above, a decision by Commerce regarding a party's status for purposes of participation in the agency's investigative process "cannot control the Court's understanding of a matter primarily related to the invocation of its powers of judicial review." Zenith Radio Corp., 5 CIT at 156. Under the facts presented in this case, because AHUG's members may be "producers" of LEU within the meaning of 19 U.S.C. § 1677(9) and 28 U.S.C. § 2631(k)(1), and therefore entitled to intervene as of right, we will grant AHUG's motion to intervene as an "interested party who was a party to the proceeding in connection with which the matter arose." 28 U.S.C. § 2631(j)(1)(B).

## Conclusion

In summary, we find that Commerce's decision not to apply the tolling regulation to the SWU contracts between enrichers and utilities, as well as its industry support determination, were neither supported by substantial evidence nor in accordance with law.  The Court remands these matters to Commerce for further proceedings consistent with this opinion.  Remand results are due seventy-five days from the date of this decision.  All parties may file responses thereto within twenty days after the filing thereof.  All parties may reply to any responses within seven days after the filing thereof.  Finally, AHUG's motion to intervene in the instant action is granted.


_____
Donald C. Pogue
Judge


_____
Evan J. Wallach
Judge


_____
Richard K. Eaton
Judge

Dated:     March 25, 2003
           New York, New York

ERRATUM

USEC Inc. v. United States, Court No. 02-00112; and Court Nos. 02-00113, 02-00114 and
      Consol. Court Nos. 02-00219; 02-00221, 02-00227, 02-00229, and 02-00233, Slip Op.
      03-34, dated March 25, 2003.

Page 1:        The headnote summary should read as follows:

{Department of Commerce's final determinations unsupported by substantial evidence on the
record and not in accordance with law, and remanded to Commerce for reconsideration.}

March 27, 2003.