(Slip Opinion)                OCTOBER  TERM,  2008                        1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* EURODIF S. A. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 07–1059.   Argued November 4, 2008 —Decided January 26, 2009*

Nuclear utilities generally procure their fuel, "low enriched uranium" (LEU), through one of two types of contracts.  Under an "enriched uranium product" (EUP) contract, the utility simply pays the enricher cash for LEU of a desired quantity and "assay," *i.e.,* its percentage of the isotope necessary for a nuclear reaction.  The amount of energy required to enrich a quantity of "feed uranium" to a given assay is described in terms of an industry standard called a "separative work unit" (SWU).  Under a "SWU contract," the utility provides a quantity of feed uranium and pays the enricher for the SWUs to produce the required LEU quantity and assay.  SWU contracts do not require that the required number of SWUs actually be applied to the utility's uranium.  Because feed uranium is fungible and essentially trades like a commodity, and because profitable operation of an enrichment plant requires the constant processing of feed uranium from the enricher's undifferentiated stock, the LEU provided to a utility under a SWU contract cannot be traced to the particular unenriched uranium the utility provided.

  Petitioners (collectively, USEC), who run the only uranium enrichment factory in the United States, petitioned the Commerce Department (Department) for relief under the Tariff Act of 1930, which calls for "antidumping" duties on "foreign merchandise" sold in this country at "less than its fair value," 19 U. S. C. §1673, but does not touch international sales of services.  USEC alleged that LEU imported from European countries under both EUP and SWU contracts was being sold in the United States at less than fair value and was

——————

*Together with No. 07–1078, *USEC Inc. et al.* v. *Eurodif S. A. et al.,* also on certiorari to the same court.

materially harming domestic industry.  In its final determination, the
Department concluded that LEU from France, including LEU ac-
quired under SWU contracts, was being sold here at less than fair
value.  Among other things, the Department rejected the claim that
such transactions were sales of enrichment services, as provided in
SWU contracts.  The Court of International Trade (CIT) ultimately
reversed, noting the "legal fiction" expressed in SWU contracts that
the very feed uranium delivered by a utility to an enricher is enriched
and then returned as LEU to the utility.  Finding that the record did
not support a determination that the enricher has any ownership
rights, the CIT reasoned that the Department's decision was unsup-
ported by substantial evidence and not in accordance with law.  The
Federal Circuit affirmed, approaching the issues much as the CIT
had.

*Held:* The Department's take on the transactions at issue as sales of
goods rather than services reflects a permissible interpretation and
application of §1673.  Because §1677(1) gives this determination to
the Department in the first instance, the Department's interpretation
governs in the absence of unambiguous statutory language to the
contrary or an unreasonable resolution of ambiguous language.  See,
*e.g., Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*,
467 U. S. 837.  Two threshold propositions must be accepted.  First,
the Department reasonably concluded that §1673 is not limited by its
terms to cash-only sales.  If that were the case, any sale of a manu-
factured product could be exempted from the section's operation by a
contractual term stating part of the purchase price in terms of a
commodity.  Second, since public law is not constrained by private
fiction, see, *e.g., Tcherepnin* v. *Knight*, 389 U. S. 332,  336, the De-
partment is not bound by the legal fiction created by SWU contracts
that the very feed uranium delivered by a utility to an enricher is en-
riched and then returned as LEU to the utility.  Thus, the test of the
Department's position turns first on whether the statute clearly ex-
cludes a transaction involving mixed payment for LEU that may and
almost certainly will be produced from uranium feed distinct from
what the utility provides.  Although it is undisputed that §1673 ap-
plies to the sale of goods, not services, the section simply does not
speak with the precision necessary to say definitively whether it ap-
plies to the LEU and the agreement giving the utility a right to get it.
This is the very situation in which the Court looks to an authoritative
agency for a decision about a statute's scope.  Once the choice is
made, the Court asks only whether the Department's application of
the statute was reasonable.  Where, as here, cash plus an untracked
fungible commodity are exchanged for a substantially transformed
version of the same commodity, the Department may reasonably

Syllabus

treat the transaction as the sale of a good under §1673.  Cf. *Powder Co.* v. *Burkhardt*, 97 U. S. 110, 116.  The Department's position is reinforced by practical reasons aimed at preserving antidumping duties' effectiveness.  It is undisputed that such duties apply to LEU sold to a domestic utility by foreign enrichers under an EUP contract calling for a single cash price that is less than fair value.  Such a transaction obviously opens the domestic enrichment industry to material injury, the very threat that §1673 was meant to counter.  But the same injury will occur if a SWU contract is untouchable.  Under a SWU contract, the domestic utility pays cash to a third party for unenriched uranium and provides this along with additional cash in exchange for LEU; any EUP contract could be structured as a SWU contract simply by splitting the transaction in two, one contract to buy unenriched uranium and another to enrich it.  And the restructuring would not stop with uranium; contracts for many types of goods would be replaced by separate contracts for the goods and for processing services, and antidumping duties would primarily chastise the uncreative.  The Department's attempt to foreclose this absurd result by treating such transactions as sales of goods is eminently reasonable.  Pp. 9–16.

506 F. 3d 1051, reversed and remanded.

SOUTER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 07–1059 and 07–1078

UNITED STATES, PETITIONER

07–1059          *v.*

EURODIF S. A. ET AL.


USEC INC., ET AL., PETITIONERS

07–1078          *v.*

EURODIF S. A. ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[January 26, 2009]

JUSTICE SOUTER delivered the opinion of the Court.

Section 731 of the Tariff Act of 1930 calls for "antidumping" duties on "foreign merchandise" sold in the United States at "less than its fair value," 19 U. S. C. §1673, but does not touch international sales of services. These cases test the application of this antidumping provision to imports of low enriched uranium (LEU), a highly processed derivative of natural uranium used as nuclear fuel, when domestic utilities contract to obtain LEU for cash plus unenriched uranium delivered to a foreign enricher. Although the parties' contracts call these transactions sales of uranium enrichment services, the Commerce Department treats them as sales of "foreign merchandise" subject to the antidumping provision. The issue is whether the Commerce Department's way of seeing the transactions as sales of goods rather than services reflects

a permissible interpretation and application of §1673.  We
hold that it does.

I

There are five steps in transforming elemental uranium
into fuel rods for nuclear powerplants.  After uranium ore
is mined, it is milled into uranium concentrate called
"yellowcake," which is next converted into uranium
hexafluoride gas or "feed uranium."  The fissionable iso-
tope in unenriched feed uranium is then concentrated,
producing LEU in pellet form, which is in turn made into
uranium fuel rods.  These cases are about the fourth step:
enriching uranium feedstock into LEU.

The uranium isotope needed for a nuclear reaction, U-
235, amounts only to .711 percent by weight of natural
uranium.  Uranium whose concentration or "assay," of U-
235 has been enhanced to 20 percent or more is weapons-
grade, highly enriched uranium (HEU), whereas LEU has
a U-235 assay of 3 to 5 percent, making it useful as nu-
clear fuel.  One way to produce LEU, and the method at
issue in these cases, is gaseous diffusion,[1] whereby gase-
ous feed uranium is pushed through a long series of filters,
separating the gas into two streams.  The stream passing
through the filters (the "product stream") gains a higher
concentration of the lighter U-235 isotope than the stream
that is filtered out (the "tails").  Because the concentration
reached at each individual filter is minor, the gas must be
forced through hundreds or even thousands of filters, at
great expenditure of electricity, before the product stream
reaches the desired assay.  The amount of energy required
to enrich a quantity of feed uranium to a given assay is
measured in terms of an industry standard called a "sepa-
rative work unit" or SWU (pronounced "swoo").  In prac-

_____
[1] LEU can also be produced through a centrifuge method or by back-
blending unenriched uranium with weapons-grade uranium.

tice, however, a given degree of enrichment will depend on adjusting the quantities of two separate variables, feed uranium and electricity, in inverse proportions. Thus, if the electric rate is stable but the value of feed uranium falls, an enricher may produce LEU by "overfeeding," subjecting a greater quantity of feed uranium to fewer SWUs, and when the value of feed uranium goes up and electricity does not, "underfeeding" can use more SWUs to squeeze extra U-235 from the tails.

Nuclear utilities generally get LEU in one of two ways. Under an "enriched uranium product" or "EUP" contract, a utility simply buys a desired quantity and assay of LEU for cash. Under a "SWU contract," the utility provides a quantity of feed uranium and pays the enricher for the SWUs to produce the quantity and assay of LEU called for.[2] Despite their name, SWU contracts do not require that the contractual number of SWUs actually be applied to the quantity of uranium provided, Notice of Final Determination of Sales at Less Than Fair Value: Low Enriched Uranium From France, 66 Fed. Reg. 65877, 65884 (2001) (hereinafter LEU from France); rather, the enricher remains free to overfeed or underfeed so long as it delivers the specified LEU. Moreover, because feed uranium is fungible, and "for all intents and purposes, trades like a commodity," *ibid.,* and because profitable operation of an enrichment plant requires the constant processing of feed uranium from the enricher's undifferentiated stock, the LEU provided to a utility under a SWU contract cannot be traced to the particular unenriched uranium the utility provided.

Petitioners, USEC Inc. and its subsidiary, United States Enrichment Corporation, (USEC collectively) run the only

—————

[2] Many SWU contracts give the utility the option of providing a comparable quantity of uranium concentrate in lieu of the specified feed uranium. App. 13, 83, 268–69 (Sealed).

uranium enrichment factory in the United States,[3] which
was built by the United States Government in the 1950s
and run by various federal agencies until it was leased to
USEC in 1998. In December 2000, USEC petitioned the
Commerce Department for relief under §731 of the Tariff
Act, alleging that LEU imported from France and other
European countries under both EUP and SWU contracts
was being sold in the United States at less than fair value
and was materially harming domestic industry. Notice of
Initiation of Antidumping Duty Investigations: Low En-
riched Uranium From France, Germany, the Netherlands,
and the United Kingdom, 66 Fed. Reg. 1080 (2001).

Section 731 of the Tariff Act of 1930, as added by §101 of
the Trade Agreements Act of 1979, 93 Stat. 144, as
amended, 19 U. S. C. §1673, provides a two-step process to
address harm to domestic manufacturing from foreign
goods sold at an unfair price:

"If—

"(1) the administering authority [the Secretary of
Commerce] determines that a class or kind of for-
eign merchandise is being, or is likely to be, sold in
the United States at less than its fair value, and

"(2) the [United States International Trade] Com-
mission determines that—

"(A) an industry in the United States—

"(i) is materially injured, or

"(ii) is threatened with material injury, or

"(B) the establishment of an industry in the United
States is materially retarded, by reason of imports of

--------

[3] There are only five major uranium enrichers in the world, a scarcity
that illustrates the "huge financial investment in facilities and a
technically skilled work force" necessary to support the enrichment
process. LEU from France, 66 Fed. Reg. 65884.

that merchandise or by reason of sales (or the likeli-
hood of sales) of that merchandise for importation,

"then there shall be imposed upon such merchandise
an antidumping duty, in addition to any other duty
imposed, in an amount equal to the amount by which
the normal value exceeds the export price (or the con-
structed export price) for the merchandise. . . ."

See also §1677(1) (designating the Secretary of Commerce
as the "'administering authority'"); §1677(2) (explaining
that the term "'Commission'" refers to the United States
International Trade Commission).

The Tariff Act's antidumping provision derives from
similar terms in the Anti-Dumping Act, 1921, 42 Stat. 11,
which were adopted to "protec[t] our industries and labor
against a now common species of commercial warfare of
dumping goods on our markets at less than cost or home
value if necessary until our industries are destroyed . . . ."
H. R. Rep. No. 1, 67th Cong., 1st Sess., p. 23 (1921).

Following the USEC charges, the Commerce Depart-
ment opened an investigation into the practices of respon-
dents, a French enricher, Eurodif, S. A., its owner, Com-
pagnie Général des Matières Nucléaires (now AREVA
NC), its U. S. subsidiary, COGEMA (now AREVA NC,
Inc.), and United States utilities that consume LEU
(Eurodif collectively).  Eurodif conceded that EUP con-
tracts were for the sale of LEU, but argued that SWU
contracts involved only the sale of uranium enrichment
services, and were therefore outside the scope of §1673.
LEU From France, 66 Fed. Reg. 65882–65883.

In its final determination, the Commerce Department
concluded that LEU from France, including LEU acquired
under SWU contracts, was being sold, or likely to be sold,
in the United States at less than fair value.[4]  *Id.,* at 65878.

--------

[4] The Commerce Department concluded in a separate determination

In deciding that SWU contracts are for a sale of LEU, not enrichment services, the Department stressed several features of the transactions. First, because the enrichment process accounts for approximately 60 percent of the value of LEU and works a "substantial transformation" on uranium feedstock, *id.*, at 65881, enrichment creates "the essential character" of LEU, *id.*, at 65884. Second, "enrichers not only have complete control over the enrichment process, but in fact control the level of usage of the natural uranium provided." *Ibid.* Third, the utilities themselves take no part in the manufacture of LEU and are the sole purchasers of the product. *Ibid.*

The Commerce Department also rejected the argument that LEU transferred pursuant to SWU contracts should not be considered "sold" in light of a "tolling" regulation then (but no longer) in effect. *Ibid.* The regulation stated that a "toller," a subcontractor who sells processing services in, or material for incorporation into, subject merchandise, would not be considered a manufacturer or producer "where the toller or subcontractor does not acquire ownership, and does not control the relevant sale, of the subject merchandise." 19 CFR §351.401(h) (2000) (withdrawn in Import Administration, Withdrawal of Regulations Governing the Treatment of Subcontractors, ("Tolling" Operations), 73 Fed. Reg. 16517 (2008) (hereinafter Tolling Operations)). This regulation, the Commerce Department explained, was intended to apply in situations where a good is first sold by a manufacturer and then resold by an exporter or reseller. LEU from France, 66 Fed. Reg. 65880. The regulation provides that in such a situation the second sale should be used to calculate the

--------

that LEU from the United Kingdom, Germany, and the Netherlands was not being sold, or likely to be sold, at less than fair value. Notice of Final Determinations of Sales at Not Less Than Fair Value: Low Enriched Uranium from the United Kingdom, Germany and the Netherlands, *id.,* at 65886.

U. S. price and normal value of the manufactured good;
however, the Commerce Department concluded, the regu-
lation was not meant to preclude antidumping duties
where a manufacturer makes the only relevant sale that
can be used to establish U. S. price and normal value.
*Ibid.; id.,* at 65884–65885.

Finally, the Commerce Department reasoned that lan-
guage in SWU contracts speaking of the transactions as
the sale of enrichment services could not control, lest
deferring to the parties' characterizations allow them to
"convert trade in goods into trade in so-called 'manufactur-
ing services,' . . . thereby exposing industries to injury by
unfair trade practices without the remedy of the [anti-
dumping] laws." *Id.*, at 65881. In economic reality, the
Commerce Department said, "the contracts designated as
SWU contracts are functionally equivalent to those desig-
nated as EUP transactions." *Id.*, at 65885.[5]

Eurodif challenged the Department's determination
before the Court of International Trade (CIT), which re-
manded for "a more persuasive explanation" of the tolling
regulation. *USEC Inc.* v. *United States*, 259 F. Supp. 2d
1310, 1326 (2003). On remand, the Commerce Depart-
ment repeated that the tolling regulation governed which
price should be used to calculate antidumping duties, not
whether imports are subject to the antidumping provision
in the first instance. Final Remand Determination, USEC
Inc. and United States Enrichment Corporation v. United
States (June 23, 2003), App. G to Pet. for Cert. 211a (here-
inafter Final Remand Determination). The Department
further explained its conclusion that SWU contracts lead
to transfers of LEU for consideration. The contracts and

―――――――
[5] In February 2002, the International Trade Commission found that
imports of LEU from France materially injured the enrichment indus-
try in the United States, allowing the imposition of antidumping duties.
U. S. Int'l Trade Comm'n, Low Enriched Uranium from France, Ger-
many, the Netherlands, and the United Kingdom (Pub. No. 3486).

other evidence in the record convinced the Department that "enrichers own, and hold title to, all the LEU they produce," *id.*, at 217a, a conclusion grounded on findings that "enrichers hold inventories of uranium from various sources, including uranium owned by the enricher itself, and produce LEU without relying solely upon the input from a particular customer." *Id.*, at 221a. Finally, the Department emphasized that the enrichers "have complete control over the enrichment process and control the amount of uranium and energy actually used in producing the LEU." *Id.*, at 231a.

The CIT was unconvinced and reversed, relying on what it candidly recognized as a "legal fiction" expressed in SWU contracts, "that the very feed uranium delivered by a utility to an enricher is enriched and then returned as LEU to the utility." *USEC Inc.* v. *United States*, 281 F. Supp. 2d 1334, 1339 (2003). The CIT reasoned, because "nothing in the record support[ed] a determination that the enricher has any ownership rights," the Commerce Department's determination was "unsupported by substantial evidence and not in accordance with law." *Id.*, at 1340.

USEC challenged this conclusion in an interlocutory appeal to the Court of Appeals for the Federal Circuit, which affirmed. *Eurodif S. A.* v. *United States*, 411 F. 3d 1355 (2005) *(Eurodif I)*. The court approached the issues much as the CIT had, with the observation that "the SWU contracts in this case do not evidence any intention by the parties to vest the enrichers with ownership rights in the delivered unenriched uranium or the finished LEU." *Id.*, at 1362. It recalled that in a previous case, *Florida Power & Light Co.* v. *United States*, 307 F. 3d 1364 (CA Fed. 2002), it had accepted the Government's position that SWU contracts were for services, not for "'disposal of personal property,'" and so were outside the cause of action provided by the Contract Disputes Act of 1978, 41

U. S. C. §601 *et seq. Eurodif I, supra*, at 1363, and n. 3 (quoting *Florida Power & Light Co., supra*, at 1373). While the court conceded that SWU agreements "do 'not fall neatly' either into the category of contracts for services or the category of contracts for the sale of goods," 411 F. 3d, at 1364 (quoting *Florida Power & Light Co., supra*, at 1373–1374), it still concluded that "even under the deferential standard of review that we apply in this case, we choose not to ignore our previous holdings." *Eurodif I, supra*, at 1363.

Shortly after this decision, we held in *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 982–983 (2005), that a court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation. On rehearing, the Federal Circuit responded to *National Cable & Telecommunications Association* by explaining that it had not rejected the Commerce Department's position because it conflicted with the prior interpretive choice that carried the day in *Florida Power & Light. Eurodif S. A.* v. *United States*, 423 F. 3d 1275, 1277–1278 (2005) *(Eurodif II)*. The Circuit, rather, saw no statutory uncertainty to be resolved: "the antidumping duty statute unambiguously applies to the sale of goods and not services" and "it is clear that [SWU] contracts are contracts for services and not goods." *Id.*, at 1278. After final judgment was entered, *Eurodif S. A.* v. *United States*, 506 F. 3d 1051, 1053 (CA Fed. 2007) *(Eurodif III)*, we granted certiorari 553 U. S. \_\_\_ (2008), to consider whether transactions under SWU contracts may be subjected to antidumping duties under the Tariff Act. We now reverse.

## II

The issue is not whether, for purposes of 19 U. S. C. §1673, the better view is that a SWU contract is one for

the sale of services, not goods. The statute gives this determination to the Department of Commerce in the first instance, §1677(1), and when the Department exercises this authority in the course of adjudication, its interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.[6]  *United States* v. *Mead Corp.*, 533 U. S. 218, 229–230 (2001) (citing *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984)). This is so even after a change in regulatory treatment, which "is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *National Cable & Telecommunications Assn.*, 545 U. S., at 981. "'[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Ibid.* (quoting *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742 (1996)).[7]

In approaching the Department's position on the appli-

_____

[6]The specific factual findings on which an agency relies in applying its interpretation are conclusive unless unsupported by substantial evidence.  5 U. S. C. §706(2)(E).

[7]Respondents' assertion that the Commerce Department's prior tolling regulation is inconsistent with its position in these cases is therefore beside the point. For the reasons given by the Department in its remand determination, we are not convinced that the tolling regulation precludes viewing SWU transactions as the sale of LEU; but even if it did, it has since been withdrawn, Tolling Operations, 73 Fed. Reg. 16517, and cannot now constrain the Commerce Department's interpretive authority under *Chevron. National Cable & Telecommunications Assn.,* 545 U. S., at 981 ("Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act"). Likewise, even if the position taken by the Department of Energy in *Florida Power & Light Co.* v. *United States*, 307 F. 3d 1364 (CA Fed. 2002), was inconsistent with the Government's position here, it would not speak to the deference owed the Commerce Department under *Chevron.*

cation of §1673, two threshold propositions must be taken as given. First, we think the Department reasonably concluded that §1673 is not limited by its terms to cash-only sales. Otherwise, any sale of a manufactured product could be exempted from the operation of §1673 by a contractual term stating part of the purchase price in terms of a commodity.[8]

Second, in applying §1673, the Commerce Department is not bound by the "legal fiction [created by SWU contracts] that the very feed uranium delivered by a utility to an enricher is enriched and then returned as LEU to the utility." *USEC*, 281 F. Supp. 2d, at 1339. The parties are free to contract as they wish, and they may genuinely regard SWU agreements as contracts for the sale of enrichment services. But, whatever the significance of such a term in a contract dispute, cf. *Florida Power & Light Co.*, 307 F. 3d 1364, it is well settled that in reading regulatory and taxation statutes, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin* v. *Knight*, 389 U. S. 332, 336 (1967). See also *Frank Lyon Co.* v. *United States*, 435 U. S. 561, 573 (1978) ("'In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are

---

[8] Respondents argue that, after determining that SWU contracts involved the sale of LEU, the Commerce Department employed an impermissible methodology by constructing the normal value of the LEU based on the combined costs to Eurodif of obtaining feed uranium and enrichment. Brief for Respondent Eurodif S. A. et al. 48–50. These calculations, respondents argue, "were a charade, underscoring that the antidumping laws cannot be applied to these SWU contracts." *Id.*, at 48. To the degree respondents' argument is that antidumping duties may never be applied to mixed cash-commodity sales, it is doomed by implausibility. If respondents are contending that the Commerce Department's dumping determination improperly assessed the normal value of LEU, they are raising an issue well outside the scope of our grant of certiorari.

not rigidly binding'" (quoting *Helvering* v. *F. & R. Lazarus & Co.*, 308 U. S. 252, 255 (1939))).  Surrender to private contractual terms is especially uncalled for in dealing with international tariffs, as Congress saw when it amended the Tariff Act to say that the sale of foreign merchandise includes "the entering into of any leasing arrangement regarding the merchandise that is equivalent to the sale of the merchandise."     Trade  and  Tariff  Act  of  1984, §602(b)(2), 98 Stat. 3024, 19 U. S C. §1673.

Since public law is not constrained by private fiction, the  test  of  the  Department's  position  turns  first  on whether the statute clearly excludes a transaction involving mixed payment for LEU that may and almost certainly will be produced from uranium feed distinct from what the utility provides.  No one disputes that §1673 applies to the sale of goods, not services, LEU From France, 66 Fed. Reg. 65882–65883.  Nor do we think anyone would deny that the exchange of cash combined with a commodity for a product that uses that very commodity as a constituent material is sometimes a sale of services and sometimes a sale of goods, the distinction being clear at the extremes. A customer who comes to a laundry with cash and dirty shirts is clearly purchasing cleaning services, not clean shirts.  And a customer who provides cash and sand to a manufacturer  of  generic  silicon  processors  is  clearly buying computer chips rather than sand enhancement services.

But the line blurs when the facts get more complicated, and SWU contracts exemplify a class of transactions that the Federal Circuit recognized does "'not fall neatly' either into the category of contracts for services or the category of contracts for the sale of goods."  *Eurodif I,* 411 F. 3d, at 1364 (quoting *Florida Power & Light Co.*, *supra*, at 1373– 1374).  The agreement is not like the laundry ticket, which says that the same shirts are supposed to come back, just minus the dirt around the collar.  And it is not on all fours

with the agreement of the chip buyer and the manufac-
turer, in which it is inescapable that the silicon processors
delivered are a separate good from the sand provided.
Section 1673 simply does not speak with the precision
necessary to say definitively whether it applies to the LEU
and the agreement that gives the utility a right to get it.

This is the very situation in which we look to an au-
thoritative agency for a decision about the statute's scope,
which is defined in cases at the statutory margin by the
agency's application of it, and once the choice is made we
ask only whether the Department's application was rea-
sonable. As to that, the Commerce Department relied on
two related characteristics of these transactions in decid-
ing SWU contracts should be treated as a sale of LEU. It
stressed that the utility in a SWU contract provides cash
plus a fungible commodity that is not tracked after its
delivery to the enricher, in exchange for a product owned
by the enricher.[9]  And it recognized that the enrichment

_____

[9] Eurodif argues that the Commerce Department erred in concluding
that enrichers own LEU prior to its delivery under a SWU contract.
*Id.*, at 36–37. While the precise form of this argument is unclear, it
fails under any reading. Respondents seem to mean that the Com-
merce Department's interpretation of §1673 is impermissible as being
inconsistent with the formal terms of SWU contracts, an argument we
rejected above. The argument could also be read to suggest that the
Commerce Department lacked substantial evidence to conclude that,
contractual formalities aside, enrichers in fact own the LEU provided
under SWU contracts prior to its delivery. But the evidence in the
record not only supports the Department's conclusion, it compels it. It
is undisputed that the LEU delivered under a SWU contract is not
actually derived from the feed uranium provided as consideration; as
CIT observed, the notion that the same feed uranium delivered by a
utility to an enricher is enriched and then returned as LEU to the
utility is "a legal fiction." *USEC Inc.* v. *United States*, 281 F. Supp. 2d
1334, 1339 (2003). Moreover, the enricher is free to vary the amount of
feed uranium used to produce an order of LEU, either stockpiling feed
uranium or supplementing its stores from other sources. Finally, the
SWU contracts at issue provide that the utility retains title to the feed
uranium until delivery of the LEU, at which point it obtains title in the

process results in a substantial transformation of the unenriched uranium.

The combination of these characteristics reasonably captures a common understanding of the sale of a good. Because an individual's shirts are not fungible, they are tracked during the cleaning process and returned to the same customer who brought them in; there are no good reasons to treat them as owned for a time by the laundry, and no one does. And without any transfer of ownership, the salient feature of the transaction is the cleaning of the shirt, a service. Conversely, where a constituent material is untracked and fungible, ownership is usually seen as transferred, and the transaction is less likely to be a sale of services, as the Court explained years ago in distinguishing a common-law bailment from a sale:

> "[W]here logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be a sale or a loan, and the title to the thing delivered vests in the manufacturer." *Powder Co.* v. *Burkhardt*, 97 U. S. 110, 116 (1878).[10]

And when the manufacturer is not only free to return

--------

LEU. In light of this process, some entity must own the LEU prior to delivery and obtain title to the feed uranium after delivery, absent some modern analog to the abhorrent possibility of an abeyance of seizen; the enricher is the only serious candidate.

[10] Common law definitions do not necessarily control the meaning of terms in modern trade laws; we merely mean to show the long pedigree of the distinction relied upon by the Commerce Department.

different material, but also substantially transforms the material it uses, it is even more likely that the object of the transaction will be seen as a new product, not work on enduring material of primary interest to the buyer. After all, what makes the hypothetical exchange of sand for silicon processors so obviously a sale of goods is the extreme transformation brought about by the chip manufacturer.

These are good analytical grounds to show that SWU transactions are reasonably placed within the ambit of sale of goods, and the Department's reliance on them is reinforced by practical reasons aimed at preserving the effectiveness of antidumping duties. There is no dispute that LEU sold under an EUP contract at less than fair value must be subjected to antidumping duties under §1673, there being a clear sale of goods when a domestic utility pays a single sale price in cash for the feed uranium and enrichment components represented by LEU. If foreign enrichers set this price below the fair value of LEU, the domestic enrichment industry is obviously open to material injury, the very threat the antidumping stat- ute was meant to counter, see H. R. Rep. No. 1, at 23. But the same injury would occur if a SWU contract were un- touchable. Under a SWU contract, the domestic utility pays cash to a third party for unenriched uranium and provides this along with additional cash in exchange for LEU; any EUP contract could be structured as a SWU contract simply by splitting the transaction in two, one contract to buy unenriched uranium and another to enrich it.[11] And the restructuring would not stop with uranium;

--------

[11] This would be particularly easy in these cases, since COGEMA, Eurodif's parent company, "is a major world supplier of natural ura- nium for the production of LEU." Final Remand Determination, App. G to Pet. for Cert. 221a, n. 38. In fact, many SWU contracts provide that if a utility fails to deliver feed uranium, the enricher will substitute feed uranium of its own, which may then be purchased from the en-

contracts for imported pasta would be replaced by sepa-
rate contracts for wheat and wheat processing services,
sweater imports would give way to separate contracts for
wool and knitting services, and antidumping duties would
primarily chastise the uncreative.[12]   The Commerce De-
partment's attempt to foreclose this absurd result by
treating SWU transactions as sales of goods is eminently
reasonable.

## III

Where a domestic buyer's cash and an untracked, fungi-
ble commodity are exchanged with a foreign contractor for
a substantially transformed version of the same commod-
ity, the Commerce Department may reasonably treat the
transaction as the sale of a good under §1673.  We there-
fore reverse the judgment of the Federal Circuit and re-
mand the cases for further proceedings consistent with
this opinion.

*It is so ordered.*

---

richer.  App. 13–14, 185–186, 537 (Sealed).

[12] Eurodif suggests the Commerce Department could combat such
circumvention of antidumping duties by taxing domestic downstream
sales of such products.  Brief for Respondent Eurodif S. A. et al. 53–54.
But this ignores the substantial number of manufactured goods that
are not resold.  More fundamentally, this argument fails to explain why
the Commerce Department should be required to chase after down-
stream resellers when the first sale has the same economic substance.