[562 U.S. 44]

MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH,
et al., Petitioners

v

UNITED STATES

562 U.S. 44, 131 S. Ct. 704, 178 L. Ed. 2d 588, 2011 U.S. LEXIS 609

[No. 09-837]

Argued November 8, 2010. Decided January 11, 2011.

APPEARANCES OF COUNSEL ARGUING CASE

**Theodore B. Olson** argued the cause for petitioners.
**Matthew D. Roberts** argued the cause for respondent.

592

Roberts, C. J., delivered the opinion of the Court, in which all other Members joined, except Kagan, J., who took no part in the consideration or decision of the case.

**OPINION OF THE COURT**

[562 U.S. 47]

Chief Justice **Roberts** delivered the opinion of the Court.

Nearly all Americans who work for wages pay taxes on those wages un-

der the Federal Insurance Contributions Act (FICA), which Congress enacted to collect funds for Social Security. The question presented in this case is whether doctors who serve as medical residents are properly viewed as "student[s]" whose service Congress has exempted from FICA taxes under 26 U.S.C. § 3121(b)(10).

## I

### A

Most doctors who graduate from medical school in the United States pursue additional education in a specialty to become board certified to practice in that field. Petitioners Mayo Foundation for Medical Education and Research, Mayo Clinic, and the Regents of the University of Minnesota (collectively Mayo) offer medical residency programs that provide

**[562 U.S. 48]**

such instruction. Mayo's residency programs, which usually last three to five years, train doctors primarily through hands-on experience. Residents often spend between 50 and 80 hours a week caring for patients, typically examining and diagnosing them, prescribing medication, recommending plans of care, and performing certain procedures. Residents are generally supervised in this work by more senior residents and by faculty members known as attending physicians. In 2005, Mayo paid its residents annual "stipends" ranging between $41,000 and $56,000 and provided them with health insurance, malpractice insurance, and paid vacation time.

Mayo residents also take part in "a formal and structured educational program." Brief for Petitioners 5 (internal quotation marks omitted). Residents are assigned textbooks and journal articles to read and are ex-

pected to attend weekly lectures and other conferences. Residents also take written exams and are evaluated by the attending faculty physicians. But the parties do not dispute that the bulk of residents' time is spent caring for patients.

### B

Through the Social Security Act and related legislation, Congress has created a comprehensive national insurance system that provides benefits for retired workers, disabled workers, unemployed workers, and their families. See *United States* v. *Lee,* 455 U.S. 252, 254, 258, and nn. 1, 7, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982). Congress funds Social Security by taxing both employers and employees under FICA on the wages employees earn. See 26 U.S.C. § 3101(a) (tax on employees); § 3111(a) (tax on employers). ■ Congress has defined "wages" broadly, to encompass "all remuneration for employment." § 3121(a) (2006 ed. and Supp. III). The term "employment" has a similarly broad reach, extending to "any service, of whatever nature, performed . . . by an employee for the person employing him." § 3121(b).

**[562 U.S. 49]**

■ Congress has, however, exempted certain categories of service and individuals from FICA's demands. As relevant here, Congress has excluded from taxation "service performed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university." § 3121(b)(10) (2006 ed.). The Social Security Act, which governs workers' eligibility for benefits, contains a corresponding student exception materially identical to § 3121(b)(10). 42 U.S.C. § 410(a)(10).

Since 1951, the Treasury Department has applied the student exception to exempt from taxation students who work for their schools "as an incident to and for the purpose of pursuing a course of study" there. 16 Fed. Reg. 12474 (adopting Treas. Regs. 127, § 408.219(c)); see Treas. Reg. § 31.3121(b)(10)–2(d), 26 CFR § 31.3121(b)(10)–2(d) (2010). Until 2005, the Department determined whether an individual's work was "incident to" his studies by performing a case-by-case analysis. The primary considerations in that analysis were the number of hours worked and the course load taken. See, *e.g.,* Rev. Rul. 78–17, 1978–1 Cum. Bull. 307 (services of individual "employed on a full-time basis" with a part-time course load are "not incident to and for the purpose of pursuing a course of study").

For its part, the Social Security Administration (SSA) also articulated in its regulations a case-by-case approach to the corresponding student exception in the Social Security Act. See 20 CFR § 404.1028(c) (1998). The SSA has, however, "always held that resident physicians are not students." SSR 78–3, Cum. Bull. 1978, pp. 55–56. In 1998, the Court of Appeals for the Eighth Circuit held that the SSA could not categorically exclude residents from student status, given that its regulations provided for a case-by-case approach. See *Minnesota* v. *Apfel,* 151 F.3d 742, 747–748. Following that decision, the Internal Revenue Service received more than 7,000 claims seeking FICA tax refunds on

[562 U.S. 50]

the ground that medical residents qualified as students under § 3121(b)(10) of the Internal Revenue Code. 568 F.3d 675, 677 (CA8 2009).

Facing that flood of claims, the Treasury Department "determined that it [wa]s necessary to provide additional clarification of the ter[m]" "student" as used in § 3121(b)(10), particularly with respect to individuals who perform "services that are in the nature of on the job training." 69 Fed. Reg. 8605 (2004). The Department proposed an amended rule for comment and held a public hearing on it. See *id.,* at 76405.

■ On December 21, 2004, the Department adopted an amended rule prescribing that an employee's service is "incident" to his studies only when "[t]he educational aspect of the relationship between the employer and the employee, as compared to the service aspect of the relationship, [is] predominant." *Id.,* at 76408; Treas. Reg. § 31.3121(b)(10)–2(d)(3)(i), 26 CFR § 31.3121(b)(10)–2(d)(3)(i) (2005). The rule categorically provides that "[t]he services of a full-time employee"—as defined by the employer's policies, but in any event including any employee normally scheduled to work 40 hours or more per week—"are not incident to and for the purpose of pursuing a course of study." 69 Fed. Reg. 76408; Treas. Reg. § 31.3121(b)(10)–2(d)(3)(iii), 26 CFR § 31.3121(b)(10)–2(d)(3)(iii) (the full-time employee rule). The amended provision clarifies that the Department's analysis "is not affected by the fact that the services performed . . . may have an educational, instructional, or training aspect." *Ibid.* The rule also includes as an example the case of "Employee E," who is employed by "University V" as a medical resident. 69 Fed. Reg. 76409; Treas. Reg. § 31.3121(b)(10)–2(e), 26 CFR § 31.3121(b)(10)–2(e) (Example 4). Because Employee E's "normal work schedule calls for [him] to perform services 40 or more hours per week," the rule provides that his service is

595

"not incident to and for the purpose of pursuing a course of study," and he accordingly is not an exempt "student" under § 3121(b)(10).

[562 U.S. 51]

69 Fed. Reg. 76409, 76410; Treas. Reg. § 31.3121(b)(10)–2(e), 26 CFR § 31.3121(b)(10)–2(e) (Example 4).

C

After the Department promulgated the full-time employee rule, Mayo filed suit seeking a refund of the money it had withheld and paid on its residents' stipends during the second quarter of 2005. 503 F. Supp. 2d 1164, 1166–1167 (Minn. 2007); *Regents of Univ. of Minn.* v. *United States,* Civ. No. 06–5084 (D Minn., Apr. 1, 2008), App. to Pet. for Cert. 47a. Mayo asserted that its residents were exempt under § 3121(b)(10) and that the Treasury Department's full-time employee rule was invalid.

The District Court granted Mayo's motion for summary judgment. The court held that the full-time employee rule is inconsistent with the unambiguous text of § 3121, which the court understood to dictate that "an employee is a 'student' so long as the educational aspect of his service predominates over the service aspect of the relationship with his employer." 503 F. Supp. 2d, at 1175. The court also determined that the factors governing this Court's analysis of regulations set forth in *National Muffler Dealers Assn., Inc.* v. *United States,* 440 U.S. 472, 99 S. Ct. 1304, 59 L. Ed. 2d 519 (1979), "indicate that the full-time employee exception is invalid." 503 F. Supp. 2d, at 1176; see App. to Pet. for Cert. 54a.

The Government appealed, and the Court of Appeals reversed. 568 F.3d 675. Applying our opinion in *Chevron U. S. A. Inc.* v. *Natural Resources*

*Defense Council, Inc.,* 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), the Court of Appeals concluded that "the statute is silent or ambiguous on the question whether a medical resident working for the school full-time is a 'student' " for purposes of § 3121(b)(10), and that the Department's amended regulation "is a permissible interpretation of the statut[e]." 568 F.3d, at 679–680, 683.

We granted Mayo's petition for certiorari. 560 U.S. 938, 130 S. Ct. 3353, 176 L. Ed. 2d 1244 (2010).

[562 U.S. 52]

II

A

We begin our analysis with ▮ the first step of the two-part framework announced in *Chevron, supra,* at 842–843, 104 S. Ct. 2778, 81 L. Ed. 2d 694, and ask whether Congress has "directly addressed the precise question at issue." We agree with the Court of Appeals that Congress has not done so. The statute does not define the term "student," and does not otherwise attend to the precise question whether medical residents are subject to FICA. See 26 U.S.C. § 3121(b)(10).

Mayo nonetheless contends that the Treasury Department's full-time employee rule must be rejected under *Chevron* step one. Mayo argues that the dictionary definition of "student"—one "who engages in 'study' by applying the mind 'to the acquisition of learning, whether by means of books, observation, or experiment' "— plainly encompasses residents. Brief for Petitioners 22 (quoting Oxford Universal Dictionary 2049–2050 (3d ed. 1955)). And, Mayo adds, residents are not excluded from that category by the only limitation on students Congress has imposed under the statute—that they "be 'enrolled and regu-

larly attending classes at [a] school.' " Brief for Petitioners 22 (quoting § 3121(b)(10)).

Mayo's reading does not eliminate the statute's ambiguity as applied to working professionals. In its reply brief, Mayo acknowledges that a full-time professor taking evening classes—a person who presumably would satisfy the statute's class-enrollment requirement and apply his mind to learning—could be excluded from the exemption and taxed because he is not " 'predominant[ly]' " a student. Reply Brief for Petitioners 7. Medical residents might likewise be excluded on the same basis; the statute itself does not resolve the ambiguity.

The District Court interpreted § 3121(b)(10) as unambiguously foreclosing the Department's rule by mandating that

**[562 U.S. 53]**

an employee be deemed "a 'student' so long as the educational aspect of his service predominates over the service aspect of the relationship with his employer." 503 F. Supp. 2d, at 1175. We do not think it possible to glean so much from the little that § 3121 provides. In any event, the statutory text still would offer no insight into how Congress intended predominance to be determined or whether Congress thought that medical residents would satisfy the requirement.

To the extent Congress has specifically addressed medical residents in § 3121, moreover, it has expressly excluded these doctors from exemptions they might otherwise invoke. See ■ §§ 3121(b)(6)(B), (7)(C)(ii) (excluding medical residents from exemptions available to employees of the District of Columbia and the United States).

That choice casts doubt on any claim that Congress specifically intended to insulate medical residents from FICA's reach in the first place.

In sum, neither the plain text of the statute nor the District Court's interpretation of the exemption "speak[s] with the precision necessary to say definitively whether [the statute] applies to" medical residents. *United States* v. *Eurodif S. A.,* 555 U.S. 305, 319, 129 S. Ct. 878, 172 L. Ed. 2d 679 (2009).

B

In the typical case, such an ambiguity would lead us inexorably to ■ *Chevron* step two, under which we may not disturb an agency rule unless it is " 'arbitrary or capricious in substance, or manifestly contrary to the statute.' " *Household Credit Services, Inc.* v. *Pfennig,* 541 U.S. 232, 242, 124 S. Ct. 1741, 158 L. Ed. 2d 450 (2004) (quoting *United States* v. *Mead Corp.,* 533 U.S. 218, 227, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)). In this case, however, the parties disagree over the proper framework for evaluating an ambiguous provision of the Internal Revenue Code.

Mayo asks us to apply the multifactor analysis we used to review a tax regulation in *National Muffler, supra.* There we explained:

**[562 U.S. 54]**

"A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's inter-

pretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute." *Id.,* at 477, 99 S. Ct. 1304, 59 L. Ed. 2d 519.

The Government, on the other hand, contends that the *National Muffler* standard has been superseded by *Chevron.* ■ The sole question for the Court at step two under the *Chevron* analysis is "whether the agency's answer is based on a permissible construction of the statute." 467 U.S., at 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694.

Since deciding *Chevron,* we have cited both *National Muffler* and *Chevron* in our review of Treasury Department regulations. See, *e.g., United States* v. *Cleveland Indians Baseball Co.,* 532 U.S. 200, 219, 121 S. Ct. 1433, 149 L. Ed. 2d 401 (2001) (citing *National Muffler*); *Cottage Savings Assn.* v. *Commissioner,* 499 U.S. 554, 560–561, 111 S. Ct. 1503, 113 L. Ed. 2d 589 (1991) (same); *United States* v. *Boyle,* 469 U.S. 241, 246, n. 4, 105 S. Ct. 687, 83 L. Ed. 2d 622 (1985) (citing *Chevron*); see also *Atlantic Mut. Ins. Co.* v. *Commissioner,* 523 U.S. 382, 387, 389, 118 S. Ct. 1413, 140 L. Ed. 2d 542 (1998) (citing *Chevron* and *Cottage Savings*).

Although we have not thus far distinguished between *National Muffler* and *Chevron,* they call for different analyses of an ambiguous statute. Under *National Muffler,* for example, a court might view an agency's interpretation of a statute with heightened skepticism when it has not been consistent over time, when it was promulgated years after the relevant statute was enacted, or because of the way in which the regulation evolved. 440 U.S., at 477, 99 S. Ct. 1304, 59 L. Ed. 2d 519. The District Court in this case cited each of these factors in

rejecting the Treasury Department's rule, noting in particular that the regulation had been promulgated after an adverse judicial

[562 U.S. 55]

decision. See 503 F. Supp. 2d, at 1176; see also Brief for Petitioners 41–44 (relying on the same considerations).

Under *Chevron,* in contrast, deference to an agency's interpretation of an ambiguous statute does not turn on such considerations. We have repeatedly held that ■ "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services,* 545 U.S. 967, 981, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005); accord, *Eurodif S. A., supra,* at 316, 129 S. Ct. 878, 172 L. Ed. 2d 679. We have instructed that "neither antiquity nor contemporaneity with [a] statute is a condition of [a regulation's] validity." *Smiley* v. *Citibank (South Dakota), N. A.,* 517 U.S. 735, 740, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996). And we have found it immaterial to our analysis that a "regulation was prompted by litigation." *Id.,* at 741, 116 S. Ct. 1730, 135 L. Ed. 2d 25. Indeed, in *United Dominion Industries, Inc.* v. *United States,* 532 U.S. 822, 838, 121 S. Ct. 1934, 150 L. Ed. 2d 45 (2001), we expressly invited the Treasury Department to "amend its regulations" if troubled by the consequences of our resolution of the case.

Aside from our past citation of *National Muffler,* Mayo has not advanced any justification for applying a less deferential standard of review to Treasury Department regulations than we apply to the rules of any other agency. In the absence of such justification, we are not inclined to carve out an approach to administra-

tive review good for tax law only. To the contrary, we have expressly "[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action." *Dickinson* v. *Zurko*, 527 U.S. 150, 154, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999). See, *e.g., Skinner* v. *Mid-America Pipeline Co.,* 490 U.S. 212, 222–223, 109 S. Ct. 1726, 104 L. Ed. 2d 250 (1989) (declining to apply "a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power").

■ The principles underlying our decision in *Chevron* apply with full force in the tax context. *Chevron* recognized that "[t]he power of an administrative agency to administer a congressionally

[562 U.S. 56]

created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." 467 U.S., at 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (internal quotation marks omitted). It acknowledged that the formulation of that policy might require "more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.,* at 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (internal quotation marks omitted). Filling gaps in the Internal Revenue Code plainly requires the Treasury Department to make interpretive choices for statutory implementation at least as complex as the ones other agencies must make in administering their statutes. Cf. *Bob Jones Univ.* v. *United States,* 461 U.S. 574, 596, 103 S. Ct. 2017, 76 L. Ed. 2d 157 (1983) ("In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems"). We see no reason why

our review of tax regulations should not be guided by agency expertise pursuant to *Chevron* to the same extent as our review of other regulations.

As one of Mayo's *amici* points out, however, both the full-time employee rule and the rule at issue in *National Muffler* were promulgated pursuant to the Treasury Department's general authority under 26 U.S.C. § 7805(a) to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. See Brief for Carlton M. Smith 4–7. In two decisions predating *Chevron,* this Court stated that "we owe the [Treasury Department's] interpretation less deference" when it is contained in a rule adopted under that "general authority" than when it is "issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos.* v. *United States,* 452 U.S. 247, 253, 101 S. Ct. 2288, 68 L. Ed. 2d 814 (1981); *United States* v. *Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S. Ct. 821, 70 L. Ed. 2d 792 (1982) (quoting *Rowan*).

Since *Rowan* and *Vogel* were decided, however, the administrative landscape has changed significantly. We have held

[562 U.S. 57]

that ■ *Chevron* deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead,* 533 U.S., at 226–227, 121 S. Ct. 2164, 150 L. Ed. 2d 292. Our inquiry in that regard does not turn on whether Congress's delegation of authority was general or specific. For example, in *National Cable & Telecommunications Assn., supra,* we held that the Federal Communications Commission was del-

egated "the authority to promulgate binding legal rules" entitled to *Chevron* deference under statutes that gave the Commission "the authority to 'execute and enforce,' " and "to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of," the Communications Act of 1934. 545 U.S., at 980–981, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (quoting 47 U.S.C. §§ 151, 201(b)). See also *Sullivan* v. *Everhart,* 494 U.S. 83, 87, 88–89, 110 S. Ct. 960, 108 L. Ed. 2d 72 (1990) (applying *Chevron* deference to rule promulgated pursuant to delegation of "general authority to 'make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions' " (quoting 42 U.S.C. § 405(a) (1982 ed.))).

We believe *Chevron* and *Mead,* rather than *National Muffler* and *Rowan,* provide the appropriate framework for evaluating the full-time employee rule. ■ The Department issued the full-time employee rule pursuant to the explicit authorization to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a) (2006 ed.). We have found such "express congressional authorizations to engage in the process of rulemaking" to be "a very good indicator of delegation meriting *Chevron* treatment." *Mead, supra,* at 229, 121 S. Ct. 2164, 150 L. Ed. 2d 292. The Department issued the full-time employee rule only after notice-and-comment procedures, 69 Fed. Reg. 76405, again a consideration identified in our precedents as a "significant" sign that a rule merits

[562 U.S. 58]

*Chevron* deference. *Mead, supra,* at 230–231,

121 S. Ct. 2164, 150 L. Ed. 2d 292; see, *e.g., Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158, 173–174, 127 S. Ct. 2339, 168 L. Ed. 2d 54 (2007).

We have explained that ■ "the ultimate question is whether Congress would have intended, and expected, courts to treat [the regulation] as within, or outside, its delegation to the agency of 'gap-filling' authority." *Id.,* at 173, 127 S. Ct. 2339, 168 L. Ed. 2d 54 (emphasis deleted). In the *Long Island Care* case, we found that *Chevron* provided the appropriate standard of review "[w]here an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, [and] where the resulting rule falls within the statutory grant of authority." 551 U.S., at 173, 127 S. Ct. 2339, 168 L. Ed. 2d 54. These same considerations point to the same result here. This case falls squarely within the bounds of, and is properly analyzed under, *Chevron* and *Mead.*

C

The full-time employee rule easily satisfies the second step of *Chevron,* which asks whether the Department's rule is a "reasonable interpretation" of the enacted text. 467 U.S., at 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694. To begin, Mayo accepts that "the 'educational aspect of the relationship between the employer and the employee, as compared to the service aspect of the relationship, [must] be predominant' " in order for an individual to qualify for the exemption. Reply Brief for Petitioners 6–7 (quoting Treas. Reg. § 31.3121(b)(10)–2(d)(3)(i), 26 CFR § 31.3121(b)(10)–2(d)(3)(i)). Mayo objects, however, to the Department's conclusion that

residents who work more than 40 hours per week categorically cannot satisfy that requirement. Because residents' employment is itself educational, Mayo argues, the hours a resident spends working make him "more of a student, not less of one." Reply Brief for Petitioners 15, n. 3 (emphasis deleted). Mayo contends that the Treasury Department should be required to engage in a case-by-case

[562 U.S. 59]

inquiry into *"what* [each] employee does [in his service] and *why"* he does it. *Id.,* at 7. Mayo also objects that the Department has drawn an arbitrary distinction between "hands-on training" and "classroom instruction." Brief for Petitioners 35.

We disagree. Regulation, like legislation, often requires drawing lines. Mayo does not dispute that the Treasury Department reasonably sought a way to distinguish between workers who study and students who work, see IRS Letter Ruling 9332005 (May 3, 1993). Focusing on the hours an individual works and the hours he spends in studies is a perfectly sensible way of accomplishing that goal. The Department explained that an individual's service and his "course of study are separate and distinct activities" in "the vast majority of cases," and reasoned that "[e]mployees who are working enough hours to be considered full-time employees . . . have filled the conventional measure of available time with work, and not study." 69 Fed. Reg. 8607. The Department thus did not distinguish classroom education from clinical training but rather education from service. The Department reasonably concluded that its full-time employee rule would "improve administrability," *id.,* at 76405, and it thereby "has avoided the wasteful litigation and continuing uncertainty that would inevitably accompany any purely case-

by-case approach" like the one Mayo advocates, *United States* v. *Correll,* 389 U.S. 299, 302, 88 S. Ct. 445, 19 L. Ed. 2d 537 (1967).

As the Treasury Department has explained, moreover, the full-time employee rule has more to recommend it than administrative convenience. The Department reasonably determined that taxing residents under FICA would further the purpose of the Social Security Act and comport with this Court's precedent. As the Treasury Department appreciated, ▇ this Court has understood the terms of the Social Security Act to " 'import a breadth of coverage,' " 69 Fed. Reg. 8605 (quoting *Social Security Bd.* v. *Nierotko,* 327 U.S. 358, 365, 66 S. Ct. 637, 90 L. Ed. 718 (1946)), and we have instructed that "exemptions from

[562 U.S. 60]

taxation are to be construed narrowly," *Bingler* v. *Johnson,* 394 U.S. 741, 752, 89 S. Ct. 1439, 22 L. Ed. 2d 695 (1969). Although Mayo contends that medical residents have not yet begun their "working lives" because they are not "fully trained," Reply Brief for Petitioners 13 (internal quotation marks omitted), the Department certainly did not act irrationally in concluding that these doctors— "who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees"— are the kind of workers that Congress intended to both contribute to and benefit from the Social Security system, 69 Fed. Reg. 8608.

The Department's rule takes into account the SSA's concern that exempting residents from FICA would deprive residents and their families of vital disability and survivorship benefits that Social Security provides. *Id.,* at 8605. Mayo wonders whether the

full-time employee rule will result in residents being taxed under FICA but denied coverage by the SSA. The Government informs us, however, that the SSA continues to adhere to its longstanding position that medical residents are not students and thus remain eligible for coverage. Brief for United States 29–30; Tr. of Oral Arg. 33–34.

\*　　\*　　\*

We do not doubt that Mayo's residents are engaged in a valuable educational pursuit or that they are students of their craft. The question whether they are "students" for purposes of § 3121, however, is a different matter. Because it is one to which Congress has not directly spoken, and because the Treasury Department's rule is a reasonable construction of what Congress has said, the judgment of the Court of Appeals must be affirmed.

It is so ordered.

Justice **Kagan** took no part in the consideration or decision of this case.