Gordon, Judge:
 

 This action involves the U.S. Department of Commerce ("Commerce") antidumping duty investigation covering welded line pipe from the Republic of Korea and the Republic of Turkey.
 
 See
 

 Welded Line Pipe from the Republic of Turkey
 
 ,
 
 80 Fed. Reg. 61,362
 
 (Dep't of Commerce Oct. 13, 2015) (final determination of sales at less than fair value) ("
 
 Final Determination
 
 ");
 
 see also
 
 Issues and Decision Memorandum for Welded Line Pipe from the Republic of Turkey, A-489-822 (Dep't of Commerce Oct. 13, 2015), available at http://enforcement.trade.gov/frn/summary/turkey/2015-25990-01.pdf (last visited this date) ("
 
 Decision Memorandum
 
 ").
 

 Before the court are the Final Results of Redetermination ("
 
 Remand Results
 
 "), ECF No. 67-1, filed by Commerce pursuant to
 
 Toscelik Profil ve Sac Endustrisi, A.S. v. United States
 
 , 41 CIT ----,
 
 256 F.Supp.3d 1260
 
 (2017), and the comments of Plaintiffs Çayirova Boru Sanayi ve Ticaret A.S. and Yücel Boru Ithalat-Ihracat ve Pazarlama A.S. (collectively, "Çayirova"), as well as Tosçelik Profil ve Sac Endüstrisi A.S. and Tosyali Dis Ticaret A.S. (collectively, "Tosçelik").
 
 See
 
 Pls.' Comments on Final Result of Redetermination Pursuant to Remand, ECF No. 74 ("Pls.' Cmts.");
 
 see also
 
 Def.'s Reply to Comments on the Remand Redetermination, ECF No. 77 ("Def.'s Resp."). For the reasons that follow, the court remands this matter to Commerce to recalculate Plaintiffs' duty drawback adjustment.
 

 I. Standard of Review
 

 The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.
 
 Nippon Steel Corp. v. United States
 
 ,
 
 458 F.3d 1345
 
 , 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 DuPont Teijin Films USA v. United States
 
 ,
 
 407 F.3d 1211
 
 , 1215 (Fed. Cir. 2005) (quoting
 
 Consol. Edison Co. v. NLRB
 
 ,
 
 305 U.S. 197
 
 , 229,
 
 59 S.Ct. 206
 
 ,
 
 83 L.Ed. 126
 
 (1938) ). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."
 

 Consolo v. Fed. Mar. Comm'n
 
 ,
 
 383 U.S. 607
 
 , 620,
 
 86 S.Ct. 1018
 
 ,
 
 16 L.Ed.2d 131
 
 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr.,
 
 Administrative Law and Practice
 
 § 9.24[1] (3d ed. 2018). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A
 
 West's Fed. Forms
 
 , National Courts § 3.6 (5th ed. 2018). Familiarity with the prior judicial and administrative decisions in this action is presumed.
 

 Separately, the two-step framework provided in
 
 Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.
 
 ,
 
 467 U.S. 837
 
 , 842-45,
 
 104 S.Ct. 2778
 
 ,
 
 81 L.Ed.2d 694
 
 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.
 
 See
 

 United States v. Eurodif S.A.
 
 ,
 
 555 U.S. 305
 
 , 316,
 
 129 S.Ct. 878
 
 ,
 
 172 L.Ed.2d 679
 
 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").
 

 II. Duty Drawback Framework
 

 Duty drawback is a term of art in international trade that typically refers to a program (in a given country) pursuant to which import duties on merchandise may be recouped by the subsequent exportation of that merchandise. The antidumping statute specifically addresses duty drawback programs by directing Commerce to increase export price by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B). Commerce applies a two-pronged test for duty drawback adjustments:
 

 (1) the import duty paid and the rebate payment are directly linked to, and dependent upon, one another (or the exemption from import duties is linked to exportation); and (2) there are sufficient imports of the imported raw material to account for the drawback received upon the exports of the manufactured product.
 

 Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback
 
 ,
 
 71 Fed. Reg. 61,716
 
 , 61,723 (Dep't of Commerce Oct. 19, 2006) ("Duty Drawback Methodology");
 
 see also
 

 Far East Machinery Co. v. United States
 
 ,
 
 12 CIT 972
 
 ,
 
 699 F.Supp. 309
 
 (1988).
 

 Turkey has a duty drawback program known as the Inward Processing Regime ("IPR").
 
 See
 

 Decision Memorandum
 
 at 7;
 
 Remand Results
 
 at 6. Under the IPR, Turkish companies apply for import duty exemptions through certificates ("DIIBs"). DIIBs detail (1) the quantity of raw materials that a company intends to import under the Turkish IPR without payment of import duties and (2) the quantity of actual exports.
 
 See
 

 Decision Memorandum
 
 at 4;
 
 Remand Results
 
 at 1.
 

 The IPR satisfies Commerce's two-pronged duty drawback test.
 
 See
 

 Decision Memorandum
 
 at 7 (
 
 citing
 

 Steel Concrete Reinforcing Bar from Turkey
 
 ,
 
 79 Fed. Reg. 54,965
 
 (Dep't of Commerce Sept. 15, 2014) (final negative determ.) and
 
 Certain Oil Country Tubular Goods from the Republic of Turkey
 
 ,
 
 79 Fed. Reg. 41,971
 
 (Dep't of Commerce July 18, 2014) (final determ.) ). In this action Commerce imposed
 additional criteria for Plaintiffs' duty drawback adjustment: (1) the claimed DIIBs must have been "closed" during the period of investigation (the "POI limitation"); and (2) the import certificates must have reflected exports to the United States of welded line pipe.
 
 See
 

 Remand Results
 
 at 3.
 

 At issue in this action is the first of those criteria, the POI limitation. The parties agree that a DIIB must have been closed,
 
 [1]
 
 but disagree about when that closure must have occurred. Commerce, as noted, requires closure during the POI. Plaintiffs argue that Commerce should include DIIBs closed prior to verification. Çayirova submitted two DIIBs to Commerce for use in its drawback adjustment, DIIBs # 1650 and # 6794. Commerce determined that neither DIIB could be used for Çayirova's drawback adjustment because DIIB # 1650 had no U.S. sales in the POI and DIIB # 6794 did not close until after the POI.
 
 See
 
 Pls.' Cmts. at 6;
 
 Remand Results
 
 at 4. Çayirova only challenges Commerce's refusal to use DIIB # 6794 due to the POI limitation. Tosçelik submitted six DIIBs to Commerce for use in its drawback adjustment, DIIBs # 2756, # 2794, # 2795, # 3171, # 5139, and # 5560. Pls.' Cmts. at 23. Commerce determined that only DIIBs # 2756 and # 2795 were suitable for use in the drawback adjustment, finding that DIIBs # 3171, # 5139, and # 5560 did not contain exports of subject merchandise to the United States and that DIIB # 2794 did not close until after the POI.
 
 See
 

 id.
 
 ;
 
 Remand Results
 
 at 4. Tosçelik only challenges Commerce's refusal to use DIIB # 2794 due to the POI limitation. Critically, Commerce collected and verified information on
 
 all
 
 of the DIIBs submitted by Plaintiffs (regardless of whether the DIIBs closed within the POI or not) for the amount of Plaintiffs' uncollected import duties.
 
 See
 

 Remand Results
 
 at 3.
 

 Commerce, for its part, has struggled to identify a reasoned basis for its POI limitation. In the
 
 Final Determination
 
 Commerce merely concluded that the POI limitation applied.
 
 Final Determination
 
 at 11. When Plaintiffs challenged that determination here, Commerce requested a voluntary remand to provide an explanation for the new criterion.
 
 See
 
 Def.'s Resp. in Opp'n to Pls.' Mot. for J. Upon the Agency R., ECF No. 43 at 14-17. On remand, Commerce tried to explain the POI limitation, but faltered. Commerce thought the POI limitation might thwart potential manipulation of "information reflected on the DIIBs prior to their closure."
 
 See
 

 Remand Results
 
 at 13. Commerce abandoned this "manipulation" rationale, however, because there was no evidence that respondents had manipulated the drawback information.
 

 Id.
 

 Consequently, in the final
 
 Remand Results
 
 , Commerce settled upon yet another new rationale for the POI limitation.
 

 Id.
 

 at 5
 
 .
 

 Commerce's newest rationale for the POI limitation is that it reasonably allows Commerce to evaluate respondents' "actual duty liability extinguished... during the POI."
 

 Id.
 

 at 8
 
 . Commerce also contends that the POI limitation helps to make computing respondents' duty drawback "more administrable for Commerce."
 

 Id.
 

 According
 to Commerce: "1) it affords Commerce sufficient time to analyze the data and notify respondents of any deficiencies; 2) it avoids the potential for the double counting of claims in multiple segments; and 3) it provides predictability and transparency in the administration of duty drawback claims."
 

 Id.
 

 at 13
 
 .
 

 III. Discussion
 

 In the
 
 Remand Results
 
 Commerce noted that "neither the duty drawback statute nor the legislative history provides guidance on the methodology to be used in determining the amount of these uncollected duties," and, "in the absence of such guidance, Commerce may develop reasonable methodologies to fill gaps in the statute."
 
 Remand Results
 
 at 7. Here, Commerce was apparently hoping to frame its POI limitation as a
 
 Chevron
 
 step two issue. Although Congress certainly was not thinking about the Turkish IPR when drafting the duty drawback adjustment provision, Congress did speak clearly when it required Commerce to increase export price by the amount of a respondent's duty drawback.
 
 See
 
 19 U.S.C. § 1677a(c)(1)(B). Against that statutory requirement, Commerce and the interested parties did an excellent job in the investigation and remand proceeding working through the complexities of the Turkish IPR. Commerce and Plaintiffs are basically in agreement on most of the challenging issues to account for Plaintiffs' duty drawback adjustment: When does a DIIB close? How does the DIIB information get reflected in Plaintiffs' margin calculation? The only remaining question is the reasonableness of Commerce's POI limitation that excluded some of the verified closed DIIBs. That question is ultimately not a legal issue resolved under the second prong of
 
 Chevron
 
 , but a substantial evidence issue in which the court evaluates the reasonableness of Commerce's POI limitation given the administrative record. As explained above, Commerce's POI limitation has always been a result in search of a rationale, and in the
 
 Remand Results
 
 , Commerce failed to identify a reasonable explanation supported by the record.
 

 Commerce tried to justify the POI limitation by equating a respondent's import duty liability with a standard "cost or expense" that goes into a respondent's overall Cost of Production ("COP") for producing subject merchandise:
 

 Given that the transactions at issues [sic] here relate to duties on imported raw materials, and that raw materials are among costs included in COP, we find that limiting the duty drawback of those duties to amounts earned during the POI to be particularly appropriate.
 

 Remand Results
 
 at 10-11. Commerce concluded that because respondents' import duty liabilities during the POI are similar to costs, Commerce's "general practice of examining costs and expenses during the POI" justifies the adoption of the POI limitation in this matter.
 

 Id.
 

 at 12
 
 .
 

 Plaintiffs persuasively counter that Commerce's explanation is unreasonable given the operation of the Turkish drawback program, and Commerce's own treatment of various other margin adjustments. Plaintiffs explain that the respondents' imports of raw materials consumed in the POI "may, or may not, have been imported under one of the DIIBs used - or opened, or closed - in the POI," and that there "is literally no linkage between DIIB usage and cost accounting, particularly since the duties foregone do not show up in the respondent's accounting system at all." Pls.' Cmts. at 11. Plaintiffs also explain
 that Commerce's claimed " 'general practice' has so many exceptions that it is more a starting point than an actual practice."
 

 Id.
 

 at 8
 
 . For instance, "[f]or annual rebates, Commerce relies on rebate ratios of the most recently completed rebate period, even if that is entirely or partially in the year before the reporting period."
 

 Id.
 

 Plaintiffs note that Commerce's claim that its analysis of COP data is limited to the POI is also not quite accurate. "In the cost of production, Commerce uses ratios for general and administrative expenses and interest expense from whatever full fiscal year closed in the period of review."
 

 Id.
 

 Through these examples (and Plaintiffs' overall persuasive command of the antidumping calculation), Plaintiffs demonstrate that Commerce's treatment of costs and expenses tends to depend on the
 
 nature
 
 of the expense, rather than a consistent, imagined adherence to calculating all costs solely that occur and are accounted for in the POI. And here, Plaintiffs' duty drawback is "
 
 not
 
 recorded in a company's books." Pls.' Cmts. at 12.
 

 Understanding that its primary justification was inadequate alone, Commerce provided a "secondary" rationale for the POI limitation, contending that it helped to make computing respondents' duty drawback "more administrable for Commerce."
 
 Remand Results
 
 at 8. According to Commerce: "1) it affords Commerce sufficient time to analyze the data and notify respondents of any deficiencies; 2) it avoids the potential for the double counting of claims in multiple segments; and 3) it provides predictability and transparency in the administration of duty drawback claims."
 

 Id.
 

 at 13
 
 .
 

 Regarding the need for time to confirm the accuracy of data, Commerce reasoned that it would be "impracticable for Commerce to rely on information concerning DIIBs closed after the POI" because "Commerce must review numerous spreadsheets, duplicate and confirm calculations set forth by the respondents and confirm calculations set forth by respondents and analyze them for errors, and conduct a new analysis to determine whether the revised data meet Commerce's two-prong test."
 
 Id.
 
 at 17. Although Commerce poses an interesting hypothetical of impracticability, there was no impracticability here because Commerce verified the usage and closure of the DIIBs on the record, including those that closed after the POI, and all of which included exports to the United States made during the POI.
 
 See
 
 Pls.' Cmts. at 6, 13, 23. Commerce's stated concerns about the timeliness of drawback data submissions do not apply to this administrative record. This action simply does not involve untimely information or a failure to honor statutory and regulatory time limits.
 
 See
 

 id.
 

 at 16
 
 . And Commerce's verification of all the closed DIIBs belies its arguments that it would be impracticable to do so. Commerce did it.
 

 Commerce's next reason about possible double-counting lacks merit. Commerce felt that without the POI limitation Commerce would need a DIIB tracking system "to prevent counting the same DIIB in multiple segments of a particular proceeding."
 
 Remand Results
 
 at 18. Commerce's double-counting rationale fails because a DIIB simply cannot be double-counted from one segment to the next. Pls.' Cmts. at 15. The duty drawback ratio is not exhausted by its having been reported in a given segment of a proceeding.
 

 Id.
 

 at 13
 
 . Two exports that are in different administrative review periods that occur on the same DIIB are entitled to the same adjustment.
 

 Id.
 

 And although Commerce hopes that, "the acceptance of DIIBs closed as of particular date ... lends additional transparency and predictability to the administration of the antidumping law,"
 
 Remand Results
 
 at 18, Plaintiffs persuasively counter that there is no "element of predictability or transparency served by denying a drawback adjustment that has been verified and the accuracy of which is not in question." Pls.' Cmts. at 15. The court agrees with Plaintiffs. Commerce's imposition of the POI limitation in this matter unreasonably undercuts its stated goals of accuracy, transparency, and predictability by ignoring verified record information. The one reasonable thing to do here is calculate Plaintiffs' duty drawback adjustments consistent with that verified information.
 

 IV. Conclusion
 

 In accordance with the foregoing, it is hereby
 

 ORDERED
 
 that Commerce shall calculate the drawback ratio using the verified information on the record, incorporating DIIB # 6794 for the calculation of Çayirova's drawback adjustment, and DIIB # 2794 for the calculation of Tosçelik's drawback adjustment; and it is further
 

 ORDERED
 
 that Commerce shall file its remand results on or before December 7, 2018; and it is further
 

 ORDERED
 
 that, if applicable, the parties shall file a proposed scheduling order with page/word limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.
 

 In the investigation Commerce considered a DIIB "closed" after it expired, at which point the DIIB holder could no longer apply any additional imports or exports to the DIIB.
 
 See
 

 Remand Results
 
 at 2 n.4. Subsequent to the investigation, and not relevant here, "Commerce's practice has since evolved, and it now defines a DIIB as closed on the date the DIIB holder applies for closure of the DIIB with the Turkish Government."
 

 Id.
 

 at 3 n.10.